UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

JOHN DOE,[1]

                    Plaintiff,

        v.

TRUSTEES OF DARTMOUTH COLLEGE
                    Defendant.

Civil Action No. _____

**COMPLAINT AND JURY DEMAND**

**INTRODUCTION**

1.      This lawsuit arises out of defendant Dartmouth College's ("Dartmouth") unjust and unlawful suspension of plaintiff John Doe in September 2020 for alleged sexual misconduct following an unfair, biased, and inept investigation influenced by a racially-biased investigator and hearing panel and a pervasive, campus-wide bias against male respondents, and African American male athletes in particular, all to Doe's detriment.

2.      In February 2020, during Winter Carnival, Doe had a consensual intimate encounter with Sally Smith, another student at Dartmouth, that included their joint, consensual—albeit ultimately unsuccessful—attempt to engage in sexual intercourse.

3.      Shortly thereafter, Smith made a complaint to Dartmouth, alleging that Doe engaged in nonconsensual sexual intercourse with her during their night together. Dartmouth opened an investigation into her complaint under its sexual misconduct policy.

---

[1] Plaintiff seeks to file this complaint and all pleadings under pseudonym due to the serious and false nature of the allegations against him and the privacy implications to both himself and Sally Smith, and has concurrently filed with this complaint a motion requesting such a designation. Plaintiff will file an affidavit, under seal, providing his name, address, and attesting to the accuracy of the facts alleged in the Complaint if the Court so requests.

4.    Dartmouth failed to follow its own policy on sexual assault investigations by providing inadequate notice of the charges against Doe, by refusing to permit him to participate in the investigation in person, and by rendering a decision based on a standard that does not exist in its policy.

5.    Dartmouth failed to fulfill its contractual obligation to provide a fair, thorough, and impartial investigation as a result of many deficiencies, including: Dartmouth's failure to provide adequate training in sexual assault investigations or issues impacting gender or racial bias to the investigator or the hearing panel members; the investigator's failure to consider evidence provided by Smith that she did give affirmative consent to sexual intercourse; the investigator's inconsistent and arbitrary application of a "prior sexual acts" exclusionary rule; and the investigator's clear subconscious bias against Black males, as evidenced by her reliance on negative stereotypes about black males and Dartmouth's failure to provide a hearing panel that included any African Americans and/or that was free from racial bias.

6.    Dartmouth, acting by and through its retained investigator, also failed and/or refused to pursue obvious areas of investigation and failed to conduct basic competent examinations of Smith despite objective evidence of inconsistencies in Smith's account of the events.

7.    Dartmouth's quasi-judicial process for hearing Smith's complaint utilized the widely discredited single investigator model and lacked basic elements of due process and/or fundamental fairness.

8.    After Doe was wrongfully found responsible based on Dartmouth's procedurally and substantively deficient investigation and adjudicatory process, Dartmouth assigned an all-white Hearing Panel to review the investigator's finding and impose a sanction on Doe.  Doe

objected to the composition of the Hearing Panel, especially because he alleged systemic racism and racial bias unfairly prejudiced the process and outcome of his case.  In response to Doe's objection, Dartmouth substituted a person Dartmouth identified as "BIPOC" ("Black, Indigenous, People of Color") who was not African American on Doe's Hearing Panel.  When pressed by Doe, Dartmouth's official position was that it had no African American person available to serve on his Hearing Panel.

9.     Although at least eight Black football players before Doe had been suspended or expelled following Title IX proceedings, Dartmouth has not provided any African American faculty or administrators with the required training to serve as qualified Hearing Panel members.

10.     In addition to breaching the contract that exists between Dartmouth and Doe, Dartmouth's improper, inadequate, and biased investigation and hearing process also violated its statutory duty under Title IX by discriminating against Doe on the basis of his gender and its statutory duties under 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964 by discriminating against Doe on the basis of his race.

## PARTIES

11.      Doe is an African American male United States citizen who resides in Ohio. At all times relevant to this complaint he was a student at Dartmouth College.

12.     Defendant Trustees of Dartmouth College is the board of trustees for Dartmouth College, a partially federally funded private liberal arts college in Hanover, New Hampshire.

## JURISDICTION AND VENUE

13.      This action arises out of Dartmouth's breach of its contractual and other obligations to Doe, as well as its violations of Title IX of the Education Amendments of 1972

(20 U.S.C. § 1681), Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), and 42 U.S.C. § 1981.

14.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because the federal law claims arise under the constitution and statutes of the United States and because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

15.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of separate states and the amount in controversy exceeds $75,000 exclusive of interests and costs.

16.     This Court has personal jurisdiction over Defendant the Trustees of Dartmouth College because it resides and conducts business within the State of New Hampshire.

17.      Venue is proper in this district under 28 U.S.C. § 1391(b).

## FACTS

### Doe's Academic and Athletic Background and Goals

18.     Doe is an African American male.

19.     Doe grew up in and currently lives in Ohio.

20.     Doe does not consume, and has never consumed, alcohol or drugs.

21.     Doe is enrolled at Dartmouth.

22.     Doe is a Black student athlete at Dartmouth.

23.     Doe majors in History.  As of the completion of the Summer 2020 term, Doe has a 3.26 GPA.

24.     In or around September 2020, Doe was suspended from Dartmouth.

25.     At the time of his suspension, Doe was a junior at Dartmouth on track to graduate in the Spring of 2022.

26.     At the time of his suspension, Doe was a defensive lineman on Dartmouth's football team.  Doe has been a member of the football team since his freshman year.  Doe was a highly recruited athlete out of high school, receiving offers from the University of Pennsylvania, Western Michigan, Toledo, Ball State, and Eastern Kentucky in addition to Dartmouth.  Doe ultimately chose to attend Dartmouth, in part, because of the people he met through the recruitment process and Coach Buddy Teeven's reputation for character formation.  Doe's success as a football player was a contributing factor to his admission at Dartmouth.

27.     Being a student athlete also has substantial intangible benefits that are of the utmost value to Doe, including the spirit of competition in chasing a championship title, the camaraderie with his teammates, and the privilege of representing his school on a public stage.  In addition, through his participation in the football program, Doe has been received information and education on sexual integrity and properly obtaining affirmative consent to sexual activity.

28.     In addition to playing football, Doe is active in many other organizations and activities, including playing on the women's basketball scout team for two seasons, participating in the Black Underground Theater Association, and attending weekly intercollegiate Bible study on campus

29.     Following the completion of his undergraduate degree, Doe intends to pursue a career in elementary education.

### Plaintiff's Interactions with Smith

30.      Doe had been friends with Smith since they both started at Dartmouth in the Fall of 2018.

31.     Previous to the early morning hours of Sunday, February 9, 2020, Doe and Smith had engaged in consensual sexual activity on at least three occasions during their freshman year but were not in a dating relationship.  During these prior encounters, Doe and Smith made out and engaged in oral sex but did not have vaginal intercourse.  During one or more of these encounters, Doe asked Smith if she wanted to have vaginal intercourse, but Smith declined.  Doe respected and honored Smith's decision not to engage in vaginal intercourse.

32.     At or around the conclusion of their freshman year, Doe's and Smith's sexual relationship ended naturally, after which they had minimal, but friendly, interactions until January 2020.

33.     On January 9, 2020, Smith posted a "Snapchat" story with a picture of a Dartmouth football game.  Doe responded to the story with a message, and then the two exchanged a few messages back and forth over the following week.  During this exchange, Smith asked Doe for his phone number, which he provided to her.

34.     On Saturday, February 1, 2020, Doe saw Smith and her roommate as he was leaving a party.  Smith hugged Doe, grabbed his wrist, and said something to him that he could not hear.  As Doe was leaving, Smith's roommate told Doe that Smith wanted to leave with him. Smith sent Doe a Snapchat message later that night stating, "You shouldn't leave so early."  Doe replied, "Ha-ha, okay, I won't next time."

35.     On Saturday, February 8, 2020, during Dartmouth's Winter Carnival weekend, Smith attended a "pre-party" at one of Dartmouth's secret societies before going to a dance party at the Shabazz Center for Intellectual Inquiry ("Shabazz Center").

36.     Smith reported that she consumed a significant volume of alcohol at the pre-party and was intoxicated by the time she left the Shabazz Center and headed back to her dorm room.

37.     At approximately 1:41 a.m. on Sunday, February 9, 2020, Smith called Doe and stated that she needed help because she didn't know where she lived.  Smith had never before contacted Doe for help getting to her room when she was drunk.  Smith contacted Doe because she knew that he did not drink and would be sober on a Saturday night during Winter Carnival at Dartmouth, a time when many students drank alcohol heavily.

38.     Doe agreed to meet Smith.  Because he had been sleeping, Doe was wearing pants but no shirt.  Doe put on a coat and shoes and left his dorm without getting fully dressed.

39.     Doe met Smith on the street and walked her to her dorm.  Doe had not been to Smith's dorm before and did not know where she lived.  Smith led Doe to her dorm.

40.     When they got to her room, Doe got Smith some water.  Doe looked to see whether Smith's roommate was in her adjoining bedroom and, not seeing her, asked Smith where her roommate was.  Doe's actions in trying to ascertain where Smith's roommate was were taken in an attempt to understand why Smith would have reached out to him for assistance getting to her dorm room, instead of reaching out to her roommate.

41.     Smith asked Doe if his intentions were to have sex, and Doe answered no.  They sat on Smith's bed and talked for a while about school and some of the events leading up to Smith calling Doe to walk her home, including where Smith had been partying with her friends and that her friends and an unnamed male freshman left her at one of the parties.  Smith told Doe that she wanted to or was going to have sex with the freshman, but they ended up not doing it because he left her at the party.  Smith put her head on Doe's shoulder.  They then began kissing and progressing to further sexual contact.

42.     Doe eventually asked Smith if she wanted to have sex and she said yes.  He asked her again if she was sure and she said yes.

43.     Doe took his pants off, and together they both took off Smith's underwear.

44.     They then attempted vaginal intercourse but encountered some difficulty with penetration.  Smith attempted to assist in guiding Doe's penis into her vagina.

45.     After two or three minutes of attempting intercourse, Smith said that it hurt, and she wanted to stop.  They immediately stopped and began to get dressed.

46.     Smith went to use the restroom and asked Doe to remain in her room until she got back, which he did.

47.     When Smith returned, she gave Doe a hug and a kiss.  Doe then left and went back to his room to sleep.

48.     The following morning, Doe spotted Smith in the dining hall and called out to her to say hello.  Smith's response was subdued, which caused Doe to reach out by Snapchat message later that day to ask if Smith was okay.  Smith responded "I'm fine.  I'm just tired."

### Smith's Complaint to Dartmouth

49.     On February 10, 2020, after sharing one or more versions of her account of the incident with several friends, Smith decided to confront Doe with her allegation that he had sexually assaulted her.

50.     Smith texted Doe asking to speak in person, and they arranged to meet at Smith's room that night.

51.     At dinner prior to meeting Doe, Smith asked her friend "Witness 1" if she would be present when Smith met Doe in her room.  Once in Smith's room, Smith and Witness 1 decided that Witness 1 would hide in Smith's roommate's adjoining room and listen to Smith's and Doe's conversation through the cracked door.

52.     Smith did not tell Doe that Witness 1 was in the other room listening.  Doe was not independently aware that Witness 1 was in the other room listening.

53.     When Doe arrived at Smith's room, Witness 1 took notes of the conversation between Smith and Doe from her hidden location in the adjoining room.  Witness 1's notes of the conversation indicate that when confronted with Smith's allegation that she had not consented to sexual intercourse with him, Doe responded that he asked Smith if she wanted to have sex and she said yes.  Witness 1's notes indicate that in response to Doe's statement, Smith asked, "But do you think I was in the right mindset to say yes?"  Witness 1's notes do not include any response from Doe to this question.

54.     On February 11, 2020, Smith went to "Dick's House"—the student health center at Dartmouth—and alleged that she had been sexually assaulted.

55.     Also on February 11, Smith obtained a Sexual Assault Nurse Examiner ("SANE") exam at Dartmouth-Hitchcock Medical Center.

56.     Sometime prior to making a report to the Title IX Office on February 13, 2020, Smith met with the Hanover Police Department ("HPD") to discuss her allegations.  Smith ultimately declined to allow HPD to proceed with an investigation.

57.     On February 13, 2020, Smith made a report to Dartmouth's Title IX Office alleging that Doe had sexually assaulted her on February 9.

58.     On February 13, 2020, following her report to the Title IX Office, Smith compiled notes of her recollection of the incident.

59.     Smith's notes also included her recollection of the conversation with Doe in her room on February 10 including her admission that she had provided verbal consent to sexual activity: "He said 'I asked' but I said 'do you think I was in the right mindset to say yes.'"

60.     In the days and weeks immediately following the incident and Smith's report to the Title IX Office, Smith told at least five other Dartmouth students about her allegation, including mentioning Doe by name.

61.     Doe did not discuss his sexual encounter with Smith with anyone until he received notice from the Title IX Office that an investigation would be conducted.  Even then, he only notified people who needed to know, like his parents, his football coach, and individuals he identified as witnesses to the Investigator because they had knowledge of his whereabouts or actions before, during, or after the incident.

62.     Based on his experiences as an African American male, Doe refrained from discussing the incident and Smith's allegations with people who did not need to know out of fear of being perceived by Dartmouth and the investigator as trying to spread a narrative regarding the incident.

### Retaliation Against John Doe for Defending Himself in the Title IX Investigation

63.     Starting in his first year at Dartmouth, Doe became a member of a chat group comprised of approximately 300 African American Dartmouth Students and Alumni.  This chat group provided Doe, who, as a Black male Dartmouth student, was already a minority among minorities at Dartmouth, with a source of community and belonging at the school, without which his experience in Dartmouth's education program would suffer the adverse effects of ostracism and isolation.

64.     After the topic of sexual misconduct arose in the chat on or around June 5, 2020, Witness 2, Smith's friend and roommate removed Doe from the group.  Doe's removal was visible to the group, and as soon as he was removed, one of Doe's classmates who was also in

the group contacted Doe to ask him why Witness 2 removed him.  The rumors surrounding

Witness 2's reasons for removing Doe from the group continued.

65.     Doe, through his advisor and his attorney, reported Witness 2 to the Investigator

and Kristi Clemens, Dartmouth's Title IX Coordinator, Clery Act Compliance Officer, and

Interim Senior Director of Institutional Diversity & Equity, for violating the Sexual and Gender

Based Misconduct Policy by retaliating against him for defending himself in the investigation of

Smith's report.  The Investigator deferred the complaint to Ms. Clemens who erroneously

determined her office did not have jurisdiction over the report because "the activities that [were]

occurring on this social platform [were] not part of a Dartmouth-sponsored or -controlled

program or activity and [were] outside the scope of the [SMP]."

### Dartmouth's Relevant Policies and Procedures

66.     At the time of the events relevant to this case, Dartmouth investigated and

administered discipline for allegations of sexual assault by students in accordance with both its

"Sexual and Gender Based Misconduct Policy" ("SMP") and its "Process for Resolving Reports

Against Students" ("PRP").  The SMP and the PRP that were in effect on February 13, 2020 are

attached hereto as **Exhibit A** and **Exhibit B**.

67.     Included as "Prohibited Conduct" under the SMP is "sexual assault," which is

defined in the SMP as:

> [H]aving or attempting to have sexual contact with another individual without
> consent . . . . Sexual contact includes:
>
> 1. sexual intercourse (anal, oral, or vaginal), including penetration with a body part
> (e.g., penis, finger, hand, or tongue) or an object, or requiring another to penetrate
> themselves with a body part or an object, however slight; or
>
> 2. sexual touching, including, but not limited to, intentional contact with the breasts,
> buttocks, groin, genitals, or other intimate part of an individual's body.

Exhibit A at II, VII.B.

68.    The SMP defines "consent" as "an affirmative and willing agreement to engage in specific forms of sexual contact with another person," and states that "[c]onsent cannot be obtained through: 1. The use of coercion or force; or 2. By taking advantage of the incapacitation of another individual."  Exhibit A at VIII.A.

69.    The SMP does not define "valid consent."

70.    The SMP defines "incapacitation" as "the inability, temporarily or permanently, to give consent because an individual is mentally and/or physical helpless, asleep, unconscious, or unaware that sexual activity is occurring."  With regard to alcohol or drugs, "incapacitation is a state beyond impairment or intoxication."  Exhibit A at VIII.C.

71.    The SMP defines "retaliation" as any adverse action or threat taken or made against an individual for making a report of Prohibited Conduct or participating in any investigation or proceeding related to this policy. Retaliation includes threatening, intimidating, harassing, or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy, such as seeking services, receiving protective measures and accommodations, and/or reporting Prohibited Conduct. Retaliation includes such conduct through associates or agents of a Complainant, Respondent, Reporting Party, or participant in any investigation or proceeding related to this policy.  Exhibit A at VIII.G.

72.    The PRP applies to Prohibited Conduct when:

> 1. the conduct occurs on Dartmouth premises or premises leased by or otherwise under the control of Dartmouth; and/or
>
> 2. the conduct occurs in the context of a Dartmouth employment, education, or research program or activity, including but not limited to Dartmouth-sponsored, Dartmouth-funded or otherwise Dartmouth-supported study abroad, research, internship, mentorship, summer session, conferences, meetings, social events, or other affiliated programs or premises, either online or in person; and/or

3. the conduct, regardless of location or context, has continuing adverse effects occurring on Dartmouth premises or in any Dartmouth employment, education, or research program or activity.

Exhibit A at III, Exhibit B at I.

73.     When a report of Prohibited Conduct is made to Dartmouth's Title IX office, the Title IX Coordinator or Deputy Title IX Coordinator will make a determination of Title IX's jurisdiction to investigate the report.  Exhibit B at II.  If the determination is made that Title IX does have jurisdiction, then the Title IX Office will proceed with an Initial Assessment "to gather information only to determine whether the Policy applies to the report and, if so, whether informal or formal resolution or any interim or remedial protective measures would be appropriate."  "The goals of the Initial Assessment are to provide a consistent, integrated and coordinated response to all reports and to ensure that all Dartmouth community members have equitable access to information about Dartmouth resources, policies and procedural options for resolving the report."  Exhibit B at III.

74.     At the conclusion of the Initial Assessment, the Title IX Coordinator or Title IX Team may propose to refer the report for informal resolution or for formal resolution:

> • Informal resolution includes the identification of interim remedial measures or community remedies to eliminate Prohibited Conduct, prevent its recurrence, and address its effects. Informal resolution does not involve disciplinary action against a Respondent.

> • Formal resolution begins with a thorough, impartial and reliable investigation. The goal of the investigation and hearing process is to gather all relevant facts, provide notice and an opportunity to be heard, and determine whether the Policy has been violated; if so, Dartmouth will impose disciplinary action if appropriate.

Exhibit B at III.

75.     "In all stages of the process, Dartmouth will apply the preponderance of the evidence standard (i.e., more likely than not) when determining whether Dartmouth policy has been violated."  Exhibit B at IV.

76.     Once formal resolution is initiated, "[t]he Title IX Office will appoint one or more trained investigators to conduct a prompt, thorough, fair and impartial investigation."  Exhibit B at VII.A.2 (emphasis added).  "Any investigator used by Dartmouth will receive annual training on the issues related to . . . sexual assault . . . and on how to conduct an investigation that is fair and impartial, provides parties with notice and a meaningful opportunity to be heard, and protects the safety of complainants while promoting accountability."  Exhibit B at VII.A.2.  "The investigator will be impartial and free from conflict of interest or bias."  Exhibit B at VII.A.2.

77.     At the outset of the investigation, the Title IX Coordinator provides notice to the Complainant and Respondent that is required to include, *inter alia*, the nature of the reported conduct and the reported policy violations.  Exhibit B at VII.A.2.  "If the investigation reveals the existence of additional or different potential policy violations . . . the Title IX Office will issue a supplemental notice of investigation."  Exhibit B at VII.A.2.

78.     With regard to the use as evidence by the investigator- of any prior sexual history between the Complainant and Responded, the PRP states:

> Where the parties have a prior sexual relationship, and the existence of consent is at issue, the sexual history between the parties may be relevant to help understand the manner and nature of communications between the parties and the context of the relationship, which may have bearing on whether consent was sought and given during the incident in question. Even in the context of a relationship, however, consent to one sexual act does not, by itself, constitute consent to another sexual act, and consent on one occasion does not, by itself, constitute consent on a subsequent occasion. The investigator will determine the relevance of this information and both parties will be informed if evidence of prior sexual history is deemed relevant.

Exhibit B at VIIA.7.

79.     Once the fact-gathering portion of the investigation is concluded, the investigator must produce an initial written investigation report, which is intended to be "a fair and thorough summary of all relevant information gathered that supports (or detracts from) the accounts of the

Complainant, the Respondent or other witnesses." Exhibit B at VII.A.9. The initial report is provided to the Complainant and Respondent and they have an opportunity to submit feedback to the investigator, after which the investigator produces a final investigative report, which "include[s] a finding as to whether there is sufficient information, by a preponderance of the evidence, to support responsibility for a violation of the [SMP] or any other Dartmouth policies that were implicated in [the] investigation." Exhibit B at VII.A.10.

80.     Following the issuance of the final investigative report, a Title IX Hearing Panel will review the finding of responsibility for procedural error that substantially affected the outcome and for proper application of the evidence standard. Exhibit B at VII.A.11. "A Title IX Hearing Panel comprises three Dartmouth Employees…: [1] The Director of the Office of Community Standards and Accountability; [2] The Dean responsible for Student Affairs designated by the Dean of the College…; and [3] A trained staff member, who holds an appointment outside the Complainant's and Respondent's declared majors or areas of concentration or School, as applicable." Exhibit B at VII.B. "The Complainant and Respondent will be informed of the composition of the Hearing Panel and may raise a challenge for actual bias or conflict of interest to the Title IX Coordinator" who "shall render a determination in writing on any such challenge, which determination shall be final." Exhibit B at VII.B.

81.     Both parties have the opportunity to submit a written statement to the Hearing Panel. "In lieu of, or in addition to, submitting a written statement, the parties will also have the opportunity to meet with the Hearing Panel if either so wishes." Exhibit B at VII.B.2.a. Additionally, while "[t]he Hearing Panel has the discretion to determine the format for the hearing" and "may convene remotely or in person to conduct the hearing and its deliberations,"

the parties "have the right to be heard by the Hearing Panel and may each decide whether to exercise that right in person or remotely."  Exhibit B at VII.B.2.a.

82.     Following a determination of responsibility, the Hearing Panel then determines an appropriate sanction, based on a number of factors for mandatory consideration, which can range from a fine or warning to suspension or expulsion.  Exhibit B at VII.B.3.

83.     Either party may appeal a final determination or responsibility and/or the sanction imposed based on: "1. Substantial procedural error or bias that materially affected the outcome and/or sanction; or 2. New evidence not reasonably available at the time of the hearing."  Exhibit B at VII.C.

84.     "Dartmouth's overarching goal is that all Complaints be investigated in a prompt, fair and impartial manner."  Exhibit B at VIII.

**Dartmouth's Procedurally Deficient Process**

85.     On February 26, 2020, Kristi Clemens, Dartmouth's Title IX Coordinator and Clery Act Compliance Officer, emailed a notice to Doe ("Notice") stating that Smith "alleged that on or about February 9, 2020, [Doe] engaged in sexual intercourse with [Smith] without her consent," and notifying him that a white female attorney at a New England law firm, ("Investigator") had been assigned as the investigator to conduct the investigation of Smith's complaint ("Investigation").

86.     At all times relevant to the Investigation, the Investigator was an agent of Dartmouth.

87.     Notwithstanding its contractual obligation, Dartmouth did not provide adequate training to the Investigator and/or did not take steps to ensure that the Investigator had received adequate training in sexual assault investigations or issues impacting gender or racial bias.

88.     After receiving the Notice, Doe submitted a written statement to the Investigator describing his relationship with Smith, his account of their interaction on February 8-9, and his assessment of her allegations.

89.     The Investigator interviewed Smith, Doe, and other witnesses, and gathered other evidence from witnesses and Dartmouth.

90.     Smith was interviewed on three separate dates: March 27, 2020, May 28, 2020, and June 24, 2020.

91.     Doe was interviewed on two dates: April 9, 2020 and June 5, 2020.

92.     The Investigator interviewed an additional seventeen witnesses between April 2 and June 18, 2020.

93.     On July 31, 2020, the Investigator issued a preliminary report ("Preliminary Report").  The Preliminary Report contained a recitation of the evidence that the Investigator gathered but did not include any conclusion about responsibility.

94.     Both Doe and Smith submitted responses to the Preliminary Report.

95.     On August 24, 2020, the Investigator issued a final report ("Final Report").  In addition to the recitation of evidence from the Preliminary Report, the Final Report includes two conclusions: 1) that "a preponderance of the available evidence does not support that [Smith] was incapacitated at the time of the incident"; and 2) that "there is a preponderance of the evidence to support that [Doe] had sexual intercourse with [Smith] without her valid consent in violation of the Sexual Assault provision of the SMP."

96.     In her Final Report, the Investigator utilized descriptive language that was more aggressive and exaggerated than the language used by witnesses, including that Smith "grabbed"

Doe's penis instead of "guided", and that Doe "yelled" Smith's name in the dining hall the following morning instead of "called out" to her.

97.     The Investigator also inferred from Doe's actions in asking where Smith's roommate was that he was "casing" the room rather than looking for a reason Smith would have called Doe to help her home rather than her roommate.

98.     On September 1, 2020, Doe submitted a statement to the Hearing Panel in response to the Final Report.  Notwithstanding its contractual obligations, Dartmouth did not provide adequate training to the Hearing Panel members and/or did not take steps to ensure that the Hearing Panel members had received adequate training in sexual assault investigations or issues impacting gender or racial bias.

99.     On September 8, 2020, Smith submitted a statement to the Hearing Panel in response to Doe's statement.

100.    On September 16, 2020, Doe submitted a "mitigation statement" to the Hearing Panel for the sanctioning process.

101.    On September 24, 2020, the Hearing Panel upheld the Investigator's findings and conclusions and imposed a sanction against Doe of suspension from Dartmouth for eight terms, amounting to essentially two full academic years.

102.    On October 1, 2020, Doe submitted a request to the Title IX Office to have the Hearing Panel's decision reviewed.

103.    On October 1, 2020, Doe submitted a statement to Professor Kathryn J. Lively, Dean of the College, concerning his request for review.

104.    On October 12, 2020, Dean Lively upheld the Investigator's and Hearing Panel's finding of responsible and the eight-term suspension imposed by the Hearing Panel.

**Dartmouth Failed to Provide Adequate Notice of the Charges Against Doe in Violation of the SMP and the PRP and Then Applied a Standard—Lack of "Valid Consent"—That Does not Exist in Dartmouth's Policy Documents When Finding Doe Responsible**

105.    The Notice of charges that Doe received at the outset of the Investigation stated that Smith had made an allegation that he engaged in sexual intercourse with [Smith] "without her consent."  The Notice did not disclose the "nature of the reported conduct" as required under the PRP, Exhibit B at VII.A.2, as it failed to disclose the nature of the allegations against him— whether Smith claimed that she was too intoxicated to give consent or, contrarily, that she expressly said no or consciously withheld consent to sexual activity.

106.    Based on the limited and vague information contained in the Notice and his interactions with Smith following the incident, including the February 10, 2020 meeting in her room where Smith acknowledged she affirmatively consented to sexual intercourse, Doe believed at the outset of the Investigation, through his first interview with the Investigator, and into his second interview, that Smith's allegation was that although she verbally consented to sexual intercourse, she actually lacked capacity to provide valid consent to sexual activity on the night in question because she was incapacitated through intoxication.

107.     Doe did not have notice and was not aware that Smith had made any allegation that she did not in fact give affirmative consent or expressly withheld consent to sexual activity.

108.    Doe thought it was undisputed that he sought, and Smith provided, consent and that the only issue was whether Smith's consent was valid.  Doe's defense was predicated on the understanding that the subject matter of the investigation was Smith's allegation that her verbal consent was invalid under the SMP.

109.    During his second interview with the Investigator on June 5, 2020, the Investigator revealed for the first time that Smith's allegations included that Doe never expressly

asked for her consent to sexual activity and that Smith never gave consent and instead said no in response to Doe's inquiry regarding sexual intercourse, irrespective of her level of intoxication.

110.    On June 9, 2020, Doe sent an email to the Investigator seeking clarification:

> I had thought this case was about [Smith's] claim that she was too intoxicated to give consent (at least that is what she told me and at least what some of her statements you shared with me seem to indicate).  However, it also appears clear from what you shared with me during our second interview that [Smith] appears to have a very clear recollection of the evening and her desire not to have sex.  That [Smith] claims she pulled away and told me she did not want to have sex, or that she had to use the bathroom as an excuse to get me to stop having intercourse with her seems to indicate that [Smith] is now claiming I forced myself on her.  Can you please clarify?

111.    On June 9, 2020, in an email response to Doe, the Investigator clarified that "[Smith] has alleged <u>both</u> that she was unable to give valid consent to the sexual intercourse with you due to her level of intoxication that night and that she did not give consent to the sexual intercourse by her express words and actions that night."  (Emphasis in original).

112.    The Investigator did not interview Doe after their June 9, 2020 email exchange to clarify any of Doe's answers to prior questions, even though Doe informed the Investigator in writing he understood the scope of the investigation was whether Smith was too intoxicated to give consent prior to sexual intercourse.

113.    The issue of insufficient notice caused by Dartmouth's mid-investigation shift in the nature of the allegations was also raised to Associate General Counsel Dana Scaduto by Doe's legal advisor.  Attorney Scaduto expressly declined on her own behalf and on behalf of the Title IX office to intercede, stating, "Under Dartmouth's policy and process for resolving complaints against students, this is not an issue which is appropriate for either the Title IX Office or the Office of General Counsel to address," and deferred the issue to the investigator, notwithstanding Dartmouth's obligation under the PRP to issue a supplemental notice when "additional or different potential violations are alleged or revealed through the investigation."

114.    No supplemental notice of investigation was ever issued at any point during the Investigation.

115.    In the Final Report, the Investigator made findings regarding both: 1) whether Smith was unable to give valid consent to the sexual intercourse due to her level of intoxication; and 2) whether Smith gave consent to the sexual intercourse by her express words and actions.

116.    The Investigator concluded that Smith did not lack capacity to give valid consent due to her level of intoxication, which would have exonerated Doe under the theory of the complaint as he understood it for most of the Investigation.

117.    Nonetheless, the Investigator found that Smith did not give and in fact expressly declined to give "valid consent" to sexual intercourse.  Therefore, Doe was found responsible on the theory for which Dartmouth did not provide adequate written notice.

118.    "Consent" is defined in the SMP.

119.    The notice of investigation alleged Doe engaged in sexual intercourse without Smith's consent.

120.    "Valid consent" is not defined in the SMP or PRP.

121.    Lack of "valid consent" was not referenced in the notice of investigation.

122.    Doe had no notice of the definition of "valid consent" or that "valid consent" was a standard that would be applied in the Investigation.

123.    Doe was found responsible based on a standard—"valid consent"—that does not exist in the SMP or PRP and was not set forth in the notice of investigation.

124.    Dartmouth's failure to give Doe adequate notice of the allegations of the violations levied against him failed to comply with Section VII.A.2 of the PRP, which requires that the Notice include the nature of the reported conduct and the reported policy violations, and

21

which requires the Title IX Office to issue a supplemental notice if additional or different potential violations are alleged or revealed through the investigation.

125.    Dartmouth's failure to define "valid consent" and/or inform Doe that "valid consent" was the standard to be applied in the Investigation failed to comply with the SMP and PRP.

### Dartmouth Improperly and Unfairly Refused to Permit Doe to Participate in the Investigation and Appear Before the Hearing Panel in Person in Violation of the SMP and PRP

126.    In March 2020, after the start of the Investigation, Dartmouth announced that the remainder of the Spring 2020 term would be conducted remotely online, and all students were directed to leave campus due to the COVID-19 epidemic.

127.    Dartmouth communicated to Doe its intent, and the Investigator's commitment, to continue the Investigation remotely.

128.    On March 19, 2020, Doe emailed Kristi Clemens to request that his interviews with the Investigator proceed in person.  Doe's request was based on his concern that the nature of video conferencing makes it difficult for one to look the other in the eye when answering questions because participants generally look at the image on the screen when talking rather than the video camera despite their best efforts, and that such a situation would negatively impact the Investigator's ability to accurately make credibility determinations, especially considering the likelihood of implicit racial and cultural bias against Doe as a Black male student athlete.

129.    On March 20, 2020, Ms. Clemens emailed Doe that she was unable to approve his request for in-person interviews.

130.    On March 26, 2020, Jane Doe—Doe's mother and his Advisor under the PRP—emailed Ms. Clemens renewing Doe's request to participate in the Investigation through in-

person interviews and an in-person hearing.  Mrs. Doe noted "several places in the Statement of Understanding provided to [Doe], [the SMP], and [the PRP] that state [Doe] ***will*** have the opportunity to meet with the investigator, meet with the panel (if necessary) and have the opportunity to be heard."  (Emphasis added).  Mrs. Doe indicated her and her husband's willingness to drive Doe to the Investigator's office, or other designated place, for a socially distanced, masked in-person interview that would comply with the guidance issued by the Centers for Disease Control ("CDC").

131.    On March 27, 2020, Ms. Clemens responded to Mrs. Doe by email and denied the request for in-person participation.

132.    Additionally, notwithstanding that Doe was attending classes remotely, Dartmouth refused to delay its investigation until such time as Doe could participate in a COVID compliant, in-person interview.

133.    Following the issuance of the Investigator's Final Report, Doe requested that he be permitted to address the Hearing Panel in person, specifically citing examples of implicit bias in the investigator's findings and the process that were exacerbated by Dartmouth's refusal to allow him to meet with the Investigator safely in person. At the time of this request, some, but not all, Dartmouth students were attending class on campus.  Ms. Clemens again denied his request.

134.    Dartmouth's refusal to provide Doe with the opportunity to safely meet in person with the Investigator and the Hearing Panel, especially when combined with the systemic racism present at Dartmouth, set forth in greater detail below, the danger of implicit bias of the Investigator, and the lack of other procedural protections afforded to students under the SMP and the PRP, failed to comply with the PRP or notions of fundamental fairness.

**Dartmouth Failed to Conduct a Thorough, Fair and Impartial Investigation and
Adjudicative Process in this Case**

135.    Dartmouth failed to provide a thorough, fair and impartial investigation and

adjudicative process in the following ways:

A.    The Investigator failed to consider the effect of Smith's intoxication on her

memory of the night in question.  Despite recognizing that Doe does not drink and

crediting Smith's assessment that she was the drunkest she had ever been, the

Investigator failed to include in her Final Report any discussion or consideration

of whether Smith's memory of events could have been affected by her

intoxication while Doe's would not have been.  The Investigator's failure to

adequately consider this evidence was a breach of Dartmouth's guarantee of a

fair, thorough, and impartial investigation and led to an erroneous outcome.

B.    The Investigator failed to adequately consider the evidence supporting the fact

that Smith gave affirmative consent.  In notes she prepared on February 13, 2020,

the same day she made her complaint to the Title IX office, Smith acknowledged

that she gave Doe verbal consent: "He said 'I asked' but I said 'do you think I was

in the right mindset to say yes.'"  This is consistent with notes Witness 1 took

while eavesdropping on Doe's conversation with Smith, which indicate that Smith

asked Doe whether he "[thought] [she] was in the right mindset to say yes" to

Doe's question asking if she wanted to have sex.  This statement by Smith

implicitly confirms both that Doe asked for affirmative verbal consent and that

Smith provided it, leaving open only the possibility that Smith was too intoxicated

to give valid consent, a finding the Investigator rejected in her final report.  The

Investigator failed to consider this evidence Smith provided that confirms Doe's

account.  The Investigator's failure to adequately consider this evidence was a breach of Dartmouth's guarantee of a fair, thorough, and impartial investigation and led to an erroneous outcome.

C.  The Investigator failed to adequately consider the fact that the results of the SANE exam—that there was no evidence of trauma—were inconsistent with Smith's account of the encounter.  As the only physical evidence available in the case, and collected within two days of the encounter, the SANE exam results are an important piece of objective documentary evidence.  Given Smith's vivid description of the encounter and the pain she claims to have experienced, it is significant that the SANE exam showed no evidence of trauma.  The Investigator's failure to adequately consider this evidence was a breach of Dartmouth's guarantee of a fair, thorough, and impartial investigation and led to an erroneous outcome.

D.  The Investigator improperly and unfairly considered the prior sexual history between Doe and Smith when she thought it favored Smith's account but refused to consider it when it favored Doe's account.  The Investigator found that the undisputed fact that Smith had always declined to have intercourse with Doe on previous sexual encounters supported Smith's account of the incident.  However, the Investigator excluded evidence provided by Doe that Smith subsequently shared with him on Snapchat that she was "no longer a virgin".  This message, Doe told the Investigator, informed Doe's understanding that Smith's twice confirmed consent to the sexual contact on the night in question was reasonable and voluntary.  The Investigator also selectively omitted from her preliminary

report and her Final Report Doe's statement that while he and Smith were talking on her bed before he twice asked her if she wanted to have sex and she twice said yes, Smith told Doe that she had wanted to or was going to have sex with a freshman she had been with at a party earlier in the night, but they ended up not doing it because he left her at the party.  The Investigator included Doe's recollection that he and Smith had talked on her bed about their classes and the current term but purposefully omitted her statement about wanting to have sex with someone else that same night.  The Investigator improperly excluded this evidence under her interpretation of the "rape shield" privilege.  However, the evidence was offered not for the truth of Smith's sexual history but for the purpose of proving Doe's state of mind as to Smith's consent.  The Investigator's failure to consider this evidence adequately and consistently was a breach of Dartmouth's guarantee of a fair, thorough, and impartial investigation and led to an erroneous outcome

E.  The Investigator improperly inferred a lack of corroborating evidence to support Doe's account based on the fact that Doe did not discuss the encounter with anyone until after receiving notice of the complaint on February 26, 2020.  The Final Report notes that Doe only spoke to three witnesses about the encounter and only after receiving notice of the complaint.  The Investigator erroneously cites this fact as undermining the credibility of Doe's account.  The Investigator failed to consider whether it was reasonable for Doe to discuss his consensual sexual encounter with Smith immediately after it occurred, especially given that such conduct could be considered sexual harassment under the SMP.  The Investigator

failed to consider that Doe had no reason to discuss the encounter with anyone until he received notice from Dartmouth that Smith had made a complaint and an investigation would be conducted.  In contrast, the Investigator found that Smith's actions in discussing the encounter with numerous people—thereby spreading a narrative that could be "corroborated" by people who did not observe the encounter—lent credibility to Smith's account.  The Investigator's failure to consider this evidence adequately and consistently was a breach of Dartmouth's guarantee of a fair, thorough, and impartial investigation and led to an erroneous outcome

F.   The Investigator improperly applied a novel standard not contained in or supported by the SMP and PRP in determining Doe's responsibility by making a finding that "there is a preponderance of the evidence to support that [Doe] has sexual intercourse with [Smith] without her **valid consent** in violation of the Sexual Assault provision of the SMP."  (Emphasis added).  The SMP prohibits "sexual assault," which it defines as "having or attempting to have sexual contact with another individual without consent". There is no discussion of a requirement for "valid consent."  Exhibit A at II, VII.B.  The SMP also provides a definition of "consent," but no definition of "valid consent."  Exhibit A at VIII.A.  The Investigator's use of a "valid consent" standard is improper and a breach of the SMP and PRP, especially in light of the Investigator's express finding that Smith did not lack capacity to give consent due to her level of intoxication.

G.   Additionally, the Investigator and Dartmouth showed their implicit bias by making and affirming a credibility finding against Doe because he did not tell

many of his friends and teammates about his consensual encounter with Smith or about her false allegations by failing to consider or wrongfully disregarding when Doe pointed out to the Investigator, the Hearing Panel and its Chair, Katharine Strong, the Title IX office, and Dean of the College, Professor Kathryn J. Lively, the Appellate Officer in his case, that his actions, or lack of actions, were deeply grounded in what he learned implicitly and explicitly as a Black male to protect himself when dealing with law enforcement and authority figures more generally. Doe learned that when confronted by law enforcement or authority figures to say little and do little because, as a Black male, his actions would be misconstrued and used against him, as the Investigator did initially and Dartmouth perpetuated by failing to provide African American faculty and administrators to participate in the disciplinary process and by upholding the Investigator's finding in this case. For example, the Investigator and Dartmouth wrongfully held it against Doe that he did not talk with many friends or teammates, tell them what happened as he remembered it, and then present them as so-called witnesses to be interviewed by the Investigator.  The adverse finding against Doe was the result of racial bias because while Doe talked with his parents and one of his football coaches about the notice and the encounter when he received the notice, he did not consider them to be "witnesses" because they only knew what Doe had told them. Culturally, Doe learned as a Black male that authority figures may view his re-telling of events and offering those he told as "witnesses" as evidence of a false narrative, self-serving fabrication, or worse, witness tampering, not corroboration. The Investigator's and Dartmouth's wrongful interpretation of this evidence

constitutes evidence of her and the school's implicit bias, was a breach of

Dartmouth's guarantee of a fair, thorough, and impartial investigation, and led to

an erroneous outcome.

H.   The Investigation was tainted by the Investigator's racial and sex-based bias.  The

Investigator's main contact with African Americans was through her employment.

The Investigator was a white, female attorney admitted in three states, New

Hampshire, Maine, and Vermont, each with an African American population of

less than 2%, who was a panelist on the topic of "Off Field Athlete Conduct

Issues:  Sexual & Domestic Violence," suggesting, in her view, a connection

between being a male athlete and sexual violence, and whose primary experiences

with African Americans come by way of her Title IX investigations in which

more often than not, African American students are either a party or a witness to

sexual assault or other wrongdoing, creating a stereotype of the hypersexual,

aggressive Black male athlete in her mind.  During the Panel Hearing, the

Investigator did not describe even one example of exposure to counter-stereotypes

or engagement in positive interactions with stereotyped group members,

specifically African American males.  Once these stereotypes were formed, on

information and belief, they influenced the Investigator's views of Doe, Smith,

and the evidence in this case, causing her to reject or ignore evidence inconsistent

with the stereotypes and make biased and unsupported credibility determinations

leading her to reach the erroneous conclusion that Doe was responsible

notwithstanding evidence to the contrary.  Because, in the single-investigator

model, the Investigator investigates, weighs the evidence, and forms conclusions

based on those determinations, implicit bias in the investigator taints the entire process.  Thus, the Investigator's implicit racial and sex-based bias constituted a breach of Dartmouth's guarantee of a fair, thorough, and impartial investigation, and led to an erroneous outcome.

I.  Many of the inferences the Investigator drew from the evidence were based on this underlying biased and stereotypical view of Doe as an aggressive, hypersexual Black male, and Black male athlete more specifically. For example: (i) the Investigator made several references in the Final Report to the fact that Doe was shirtless under his jacket when he met Smith, without referencing the undisputed fact that he was sleeping when Smith called, and typically sleeps without a shirt, as many men do; (ii) the Investigator discounted Doe's recollection that Smith assisted in the removal of her underwear, in favor of Smith's lack of memory admittedly impaired by alcohol and her speculation, steeped in implicit racial bias, stereotypes, and racially coded language that Doe is so big he could have removed them with one hand; (iii) the Investigator failed to eliminate African American cultural norms as a source of Doe's decisions to tell very few people about his consensual sexual encounter with Smith or not to prime his witnesses with details consistent with his recollection of the encounter and instead discredited Doe's actions in responding to the complaint, which were rooted in his learned experience as a Black male who has experienced systemic racism when dealing with law enforcement and other authorities; (iv) the Investigator utilized descriptive language that was more aggressive and exaggerated than the language used by witnesses, e.g. "grabbed" instead of

"guided" when discussing Smith's actions of guiding Doe's penis, "yelled" instead of "called out" when describing how Doe spoke to get Smith's attention when he saw her the following morning; (v) the Investigator inferred from Doe's actions in asking where Smith's roommate was that he was "casing" the room rather than looking for a reason Smith would have called Doe to help her home rather than her roommate.  These examples of the Investigator's implicit racial bias tainted the entire Title IX process, constituting a breach of Dartmouth's guarantee of a fair, thorough, and impartial investigation, and led to an erroneous outcome.

J.   The Investigator failed to conduct any thorough follow-up investigation upon finding out during Smith's <u>third</u> interview that Smith had first met with HPD about her allegations prior to initiating the Dartmouth investigation.  The Investigator failed to request documentation of HPD's contact with Smith, including any interview transcripts to determine whether Smith's account to HPD was consistent or inconsistent with her account to the Investigator.  The Investigator's failure to investigate this potential source of evidence was a breach of Dartmouth's guarantee of a fair, thorough, and impartial investigation and led to an erroneous outcome.

K.   The investigator failed to conduct any thorough follow-up investigation upon learning during Smith's <u>third</u> interview that Smith had called her ex-boyfriend on February 9 prior to reaching out to Doe for help getting home.  The Investigator explained to Smith that it was important for the Investigator to speak to Smith's ex-boyfriend and asked Smith to contact her ex-boyfriend to confirm whether

they spoke on February 9.  Smith later emailed the Investigator and claimed that her ex-boyfriend did not pick up when she called, and they did not have a conversation.  The Investigator failed to take any investigatory steps to confirm this representation or to interview the ex-boyfriend.  Additionally, the Investigator failed to inquire further about Smith's relationship with this individual and why she contacted him on the night in question.  The Investigator's failure to investigate this potential source of evidence that the Investigator herself said was important was a breach of Dartmouth's guarantee of a fair, thorough, and impartial investigation and led to an erroneous outcome.

L.  Dartmouth's Title IX Coordinator, Ms. Clemens, erroneously determined her office did not have jurisdiction over Doe's report of retaliation.

    i.  On or about June 5, 2020, Smith's roommate, friend, and one of her primary witnesses, Witness 2, removed Doe from a chat group comprised of approximately 300 African American Dartmouth students and alumni of which Doe had been a member since his freshman year.

    ii.  The chat group provided Doe with a source of community and belonging at Dartmouth without which his experience in Dartmouth's education program would suffer the adverse effects of ostracism and isolation.

    iii. After the topic of sexual misconduct arose in the chat in June 2020, Witness 2 removed Doe from the group.  Doe's removal was visible to the group, and as soon as he was removed, one of Doe's classmates who was also in the group contacted Doe to ask him why Witness 2 removed him.

The rumors surrounding Witness 2's reasons for removing Doe from the group continued.

iv. Doe, through his advisor and his attorney, reported Witness 2 to the Investigator and Ms. Clemens for violating the SMP by retaliating against him for defending himself in the investigation of Smith's report. The Investigator deferred the report to Ms. Clemens who erroneously determined her office did not have jurisdiction over the report because "the activities that [were] occurring on this social platform [were] not part of a Dartmouth-sponsored or -controlled program or activity and [were] outside the scope of the [SMP]."

v. Ms. Clemens erroneously failed to consider that her office had jurisdiction over Witness 2's conduct "regardless of location or context," because it could be considered retaliation under the SMP that had "continuing adverse effects" in Dartmouth's education program. In so doing, Ms. Clemens, and by extension, Dartmouth, breached its obligation to Doe under the SMP and PRP and engaged in race and sex-based selective enforcement of the same by aggressively pursuing Smith's report against Doe but foreclosing Doe from pursuing his report against Smith's agent, Witness 2.

**Dartmouth Failed to Provide a Hearing Panel and Process That Was Free from Bias**

136.   Following the Investigator's issuance of the Final Report in which Doe was erroneously found responsible, the matter proceeded to a Hearing Panel.

137.   Doe received notice from Ms. Clemens of the three administrators who would make up the Hearing Panel:  Kate Burke, Katharine Strong, and Ted Stratton.  On September 8,

2020, Doe objected to the composition of the Hearing Panel on the basis of race. Given that he had asserted that the Investigator's racial bias and systemic racism at Dartmouth led to biased and inaccurate credibility findings and an unfair and erroneous finding against him, Doe objected to Ms. Clemens, who, as a white female, was serving both as the Title IX Coordinator and the Interim Senior Director of Institutional Diversity & Equity, to the all-white panel that Dartmouth and the Title IX office assembled to review his case and requested that an African American panelist be added to the Hearing Panel.

138. Ms. Clemens responded that she thought her office could accommodate Doe's request but would need to review their list of trained panel members. Following Doe's objection, Ms. Clemens assigned Jedrek Dineros from the Office of Residential Life to the Hearing Panel.

139. On September 9, 2020, Doe emailed Ms. Clemens and asked: "Given the issue I raised about racial bias, and the reassignment [of Mr. Dineros], am I to understand that there are no trained African Americans to sit on my panel?" Ms. Clemens responded the same day: "I do not know how Jedrek self-identifies specifically, but he is BIPOC [Black, Indigenous, and/or person of color]. . . . We do not have anyone who I am aware identifies as African American available to serve on this hearing panel."

140. Dartmouth did not have any African American staff members trained available to serve as hearing panel members under the SMP and PRP at the time notwithstanding Dartmouth's knowledge that African American students had been both reporting and responding students under Dartmouth's Title IX's policy presently and in the past, including at least nine African American football players who had been suspended or expelled under Dartmouth's Title IX policy prior to Doe.

141.     Dartmouth's inability or unwillingness to provide the required training to any Black faculty or administrators such that they would be qualified generally and available to serve on Doe's Hearing panel is a result of and a manifestation of the long-standing systemic racism at Dartmouth as set forth below.

142.     The Hearing Panel with no African American members conducted a superficial and inadequate inquiry into the Investigator's bias and exhibited implicit bias of its own.  The Panel asked the Investigator one question about her training on bias, which was superficial and insufficient to ascertain implicit bias, which, by its nature, is nuanced and difficult to apprehend if not specifically sought out.  The Hearing Panel did not ask any questions about the Investigator's exposure to counter-stereotypes or engagement in positive interactions with stereotyped group members in her daily life outside of her investigations or what cultural norms she eliminated when holding the fact that Doe did not tell anyone about his consensual sexual encounter with Smith against Doe's credibility, even though Doe specifically requested that the Panel do so.  The Panel's own implicit bias and failure to adequately probe the Investigator's implicit bias resulted in racially coded and discriminatory language and stereotypes used and relied on by the Investigator to go undetected and uncorrected by the Panel.

143.     Katherine Strong, another white female, who was the Director of the Office of Community Standards and Accountability and Chair of the Hearing Panel, displayed an inappropriate level of familiarity with the Investigator during the Hearing, such as calling her by her first name.  Upon information and belief, Ms. Strong has worked with the Investigator on a number of cases over which time they had developed a friendly relationship.  Ms. Strong's existing relationship with the Investigator combined with her in-group bias and which evidences Ms. Strong's lack of impartiality when reviewing the Investigator's findings.

35

144.     Dartmouth's failure to train and have available any African American panel members at the time of Doe's Panel Hearing, the Panel's inadequate inquiry into the Investigator's implicit bias, its own display of implicit bias, and Ms. Strong's familiarity with and in-group bias toward the Investigator deprived Doe of a fair, unbiased hearing in breach of Dartmouth's guarantee of a fair, thorough, and impartial investigation, constituted discrimination on the basis of race, and led to an erroneous outcome.

**<u>Systemic Racism Is Deeply Rooted in Dartmouth's History and Present Institutions Including, But Not Limited to, the Enforcement and Application of Dartmouth's Title IX Policies</u>**

145.     The history of Dartmouth is inextricably tied to slavery.  In 1776, shortly after Dartmouth College was founded, while it was not uncommon for doctors or ministers in the north to own one or two slaves, the founder and first president of Dartmouth College, Rev. Eleazar Wheelock, owned 19 slaves, many more than most in his position at that time.[2] Dartmouth College archivist, Peter Carini, catalogued a letter Dartmouth President Wheelock wrote in 1776 in which he spoke of purchasing a wheel of cheese and an African American human being in the same in the same breath.[3]  For Carini this letter raised "questions about the responsibilities [Dartmouth College] has in terms of acknowledging its ties to slavery, and the legacy of slavery in Hanover and the Upper Valley."[4]  However, unlike other Ivy League schools, like Brown University, which has "engaged in high-profile, institutional examinations of their involvement with slavery," Dartmouth has not done that.[5]

---

[2] Golec, Matt, <u>Research helps Dartmouth confront the ties to slavery in its past</u>, Valley News, Sept. 7, 2019, available at https://www.vnews.com/Dartmouth-to-explore-past-ties-to-slavery-28085959 (last visited Nov. 1, 2020).
[3] <u>Id.</u>
[4] <u>Id.</u>
[5] <u>Id.</u>

146.    Specifically, "Dartmouth is not a member of Universities Studying Slavery, a collaboration among 62 other universities — including fellow Ivy League schools Brown University, Columbia University and Harvard University — working to address 'historical and contemporary issues dealing with race and inequality in higher education' and 'the complicated legacies of slavery in modern American society.'"[6]

147.    Dartmouth's approach has been described as more "decentralized," and involves, in part, the work of Dartmouth sociology professor, Deborah King, who teaches an undergraduate course at Dartmouth entitled Lest We Forget: History, Collective Memory and Slavery at Dartmouth.[7]  In the course, students learn about Dartmouth's "economic entanglement in the trade and slaveholding; as a site for the intellectual legitimation and contestation of slavery; and the contributions of enslaved persons to its development."[8]  In the past, students have learned how "Nathan Lord, Dartmouth's president at the start of the Civil War, who went from being an abolitionist to a slavery apologist and was forced to resign…."[9]  In 2020, only one white student enrolled in Professor King's course, notwithstanding that Dartmouth is 62% Caucasian and only 11% Black or African American.[10]

148.    Professor King explained that Dartmouth "wants to do is forget all this history and say, 'Okay, we're going to be a diverse institution, and we want to be inclusive now," but, she continued, "You can't do that because we won't recognize and appreciate how, implicitly

---

[6] Cano, Christian, A Complicated History: Slavery at Dartmouth, The Dartmouth, Feb. 19, 2020 (last visited Nov. 12, 2020).
[7] Golec, Matt, Research helps Dartmouth confront the ties to slavery in its past, Valley News, Sept. 7, 2019, available at https://www.vnews.com/Dartmouth-to-explore-past-ties-to-slavery-28085959 (last visited Nov. 1, 2020); Id.
[8] https://dartmouth.smartcatalogiq.com/en/current/orc/Departments-Programs-Undergraduate/Sociology/SOCY-Sociology/SOCY-79-08 (last visited Nov. 12, 2020).
[9] Id.
[10] https://www.thedartmouth.com/article/2020/02/slavery-at-dartmouth.
https://admissions.dartmouth.edu/apply/class-profile-testing (last visited Nov. 12, 2020).

and explicitly, the institution – structurally, operationally and culturally – carries on that legacy."[11]

149.    Professor King expressed that she would like "Dartmouth to do more at the institutional level," like "other schools [that] have established policy centers, started programs, or memorialized enslaved people," but she recognized "the funding and structural challenges involved" at doing that at Dartmouth."[12]

150.    In November 2019, Christianne Hardy, special assistant to Dartmouth President Philip J. Hanlon, acknowledged, "We do still need to have a reckoning with the role of slavery in how it affects Dartmouth, but even more specifically how does it affect our African American students, how does it affect their ability to be fully functional students here?"[13]

151.    Implying Dartmouth has not yet reached that goal, Hardy said she "hopes Dartmouth can learn from all of its past in order to create an environment where everyone can feel safe and included, and no people are ignored."[14]

152.    On May 31, 2020, six days after George Floyd was murdered in Minneapolis, Minnesota at the hands of law enforcement,[15] President Hanlon sent a message to the Dartmouth community that "named the structural racism at the core of our nation," but "failed to reckon with the blatant culture of institutional and quotidian racism at the College" itself.[16]

---

[11] https://www.thedartmouth.com/article/2020/02/slavery-at-dartmouth.
[12] Id.
[13] Golec, Matt, Research helps Dartmouth confront the ties to slavery in its past, Valley News, Sept. 7, 2019, available at https://www.vnews.com/Dartmouth-to-explore-past-ties-to-slavery-28085959 (last visited Nov. 1, 2020).
[14] Id.
[15] https://en.wikipedia.org/wiki/Killing_of_George_Floyd.
[16] Open Letter to the Board of Trustees of Dartmouth College, Dartmouth College President Philip J. Hanlon & Members of Dartmouth's Senior Leadership Team, July 14, 2020, at 2, available at https://docs.google.com/forms/d/e/1FAIpQLSdnG4s4g4HoIc-zvNw75Qs3q7_BcvlHoH4tItFAsqID0FAwFw/viewform (last visited Nov. 1, 2020) ("Open Letter").

153.    On July 14, 2020, over 300 members of the Dartmouth community, including

members of Dartmouth's faculty and administration, current students, and alumni, many of them

BIPOC, wrote and signed a letter "to the Dartmouth senior leadership in an effort to move the

College to take concrete steps to unravel its built-in structural racism perpetuated through the

superficial and short-term fixes that our senior leadership constantly applies to the problem."[17]

154.    The letter followed from a June 17, 2020 meeting attended by President Phillip

Hanlon, Provost Joseph Helble, Dean of the Faculty Elizabeth Smith, Dean of the College

Kathryn Lively, Associate Dean for International and Interdisciplinary Programs Dennis

Washburn, and Chair of the Board Trustees Laurel Richie, where the signatories "presented a

plan of concrete actions that would effectively address the high turnover among Black staff, the

poor retention of Black faculty, the weakened state of the program in African and African

American Studies (AAAS), **the commonplace racial harassment of Black students on

campus**, the absence of Black leadership at the College, and, **overall, the racially hostile

working, living and studying conditions at the College**.  This plan was informed by and in

conversation with the numerous reports Dartmouth has commissioned since the assassination of

Martin Luther King, Jr."  (emphasis added).  In that letter, the signatories wrote, "We call on the

senior leadership and Board of Trustees to dismantle the structures that implicitly or explicitly

work against and devalue Black, Brown, and other people of color at Dartmouth."  Specifically,

the signatories called for the hiring and retention of BIPOC to the senior leadership of

Dartmouth, recognizing that:

> Dartmouth's aspiration to be anti-racist is stymied by its exclusion of Black,
> Indigenous, and People of Color (BIPOC) representatives from its senior
> leadership. The institutional failures at Dartmouth to hire, retain, and promote
> BIPOC faculty are long-standing. This set of failures has produced a consistently
> White leadership at the institution for decades and they continue under the current

---

[17] Open Letter at 1.

administration. At our June 17 meeting, President Hanlon admitted that he had failed, as (with the exception of the general counsel) every member of his senior leadership team is White, and further, that all but one of the searches under his presidency have yielded the appointment of White men and women. He acknowledged the need to do better. We agree.[18]

155.    The July 14, 2020 Letter is attached hereto as **Exhibit C** and available at

https://docs.google.com/forms/d/e/1FAIpQLSdnG4s4g4HoIc-

zvNw75Qs3q7_BcvlHoH4tItFAsqID0FAwFw/viewform (last visited Nov. 1, 2020).

156.    The racial bias in Dartmouth's Title IX process that poisoned the investigation,

hearing, sanctioning, and review process in Doe's case is a symptom of the implicit and explicit

institutional and systemic racism that is deeply rooted in Dartmouth's history, structure,

operations, culture and indicative of the "racially hostile" environment Black students,

professors, and employees endure at Dartmouth.

157.    For instance, upon information and belief, current and/or former Dartmouth

employees have observed that white students are treated more favorably than Black students in

Title IX investigations.  Based on information and belief, since 2005, at least 9 Black male

football players were suspended or expelled following Title IX proceedings whereas no Title IX

complaints against white football players were referred by the Title IX office for formal

investigation during that same time period.  Additionally, based upon information and belief, in

at least one case from 2005 to the present, a white student athlete was allowed delay the

imposition of a suspension as a result of a Title IX investigation so that he could complete his

athletic season whereas the sanctions imposed on the Black football players were immediately

enforced and the Black students removed from the school and team immediately, losing at least

that year of athletic eligibility.

---

[18] Id. at 2-3.

158.     Additionally, on information and belief, similar discrimination on the basis of race exists with respect to violations of the Dartmouth Academic Honor Principle and issues of academic dishonesty.

159.     On information and belief, on at least one occasion, a white Dartmouth football player accused of cheating was spared consequences while a Black football player accused of cheating was suspended or expelled from the school.

160.     Also during this same time period, on information and belief, Black students who have sought counseling services at Dick's House to cope with racism at Dartmouth are asked to take a leave of absence if they sought assistance too frequently, depriving them of educational opportunities on the basis of race.

**Faced With Internal and External Pressure to Crack Down on Sexual Assaults, Dartmouth Exhibits a History and Practice of Bias in Favor of Female Reporting Students and Against Male Responding Students Even as Its Sexual Misconduct Policy Evolved**

161.     Before, during, and since the pendency of the Investigation against Doe, significant attention at Dartmouth had and has been focused on the issues of violence against women and sexual misconduct, as a result of both external pressure from the Federal government and internal pressure from members of the Dartmouth community.

162.     On April 4, 2011, Russlyn Ali, Assistant Secretary for Civil Rights at the U.S. Department of Education, issued a "Dear Colleague" letter to schools and universities setting forth the Department's position on schools' obligations to prevent and address sexual harassment and violence under Title IX. https://obamawhitehouse.archives.gov/sites/default/files/dear_colleague_sexual_violence.pdf.

163.     The now discredited Dear Colleague Letter included several procedural requirements and suggestions for schools to utilize in investigating and preventing sexual

violence and clarified that noncompliance with the Department's stated position on the issue could result in the loss of Federal funding.

164.     The Dear Colleague Letter states: "If a school knows or reasonably should know about student-on-campus harassment[19] that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."  Dear Colleague Letter at 4.

165.     The Dear Colleague Letter includes the Department's position that schools must utilize a preponderance of the evidence standard in investigations of sexual violence, rather than a clear and convincing standard.  Id. at 11 ("Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX.").

166.     The Dear Colleague Letter confirms that in a school's Title IX investigation, "the parties must have an equal opportunity to present relevant witnesses and other evidence," however "[the Department] strongly discourages schools from allowing the parties to personally question or cross-examine each other during the hearing."  Id. at 11-12.  The Dear Colleague Letter does not mention whether schools may allow parties to submit questions to an investigator who will then ask the other party.

167.     On September 22, 2017, the Department issued a letter withdrawing the 2011 Dear Colleague Letter as well as the "Questions and Answers on Title IX and Sexual Violence" issued April 29, 2014.  Letter from Candice Jackson, Acting Assistant Secretary for Civil Rights, U.S. Dep't of Education, Sep. 22, 2017, available at

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

---

[19] The use of the term "harassment" or "sexual harassment" in the Dear Colleague Letter includes "sexual violence." Dear Colleague Letter at 1, n. 2.

168.    In support of this action, the Department cited concerns that the 2011 and 2014 guidance documents led to "deprivation of rights" for students and that the Department had not followed a formal public notice and comment process before issuing the 2011 and 2014 guidance documents.  Id.

169.    The Department acknowledged that the Dear Colleague Letter placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." Id., citing "Open Letter form the Members of the Penn Law School Faculty," Sexual Assault Complaints: Protecting Complainants and the Accused at Universities, Wall St. J. Online (Feb. 18, 2015); "Rethink Harvard's Sexual Harassment Policy," Boston Globe (October 15, 2014) (schools adopted procedures that "lack the most basic elements of fairness and due process, and overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.").

170.    In place of these documents, the Department issued a new question and answer document – the September 2017 Q&A on Campus Sexual Misconduct – to guide institutions while the Department conducts an official rulemaking process to promulgate new Title IX regulations.  "Q&A on Campus Sexual Misconduct," U.S. Dep't of Education, September 2017, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

171.    The new Q&A guidance makes clear the Department's expectation that the standard of evidence for school's investigations of sexual violence under Title IX be the same as the standard used in other disciplinary proceedings, thus requiring many schools to either raise the standard used in Title IX investigations, or lower the standard used in all other proceedings.

172.    The Q&A guidance also reversed the Department's previous controversial policy that required school to provide appeal rights to both complaining and responding parties equally.

173.    On November 29, 2018, the Department issued proposed regulations to implement Title IX.  "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 83 Fed. Reg. 61462 (Nov. 29, 2018) ("Proposed Regulations").  The Proposed Regulations follow the Department's withdrawal of the 2011 Dear Colleague Letter and its own investigation of Title IX compliance in school sexual assault investigations and proceedings, which included discussions with various stakeholders.

174.    One of the stated goals of the Proposed Regulations is to "[e]stablish procedural safeguards that must be incorporated into a recipient's[20] grievance procedures to ensure a fair and reliable factual determination when a recipient investigates and adjudicates a sexual harassment complaint."  Id.

175.    As part of its own investigation into how recipients handle Title IX complaints, the Department reviewed various criticisms of the policies set forth under the Dear Colleague Letter and other previous guidance, including criticism "that those guidance documents pressured schools and colleges to forgo robust due process protections."  Id. at 61464.

176.    Deficiencies in recipient responses to Title IX complaints identified by the Department include "lack of notice to the parties, lack of consistency regarding both parties' right to know the evidence relied on by the school investigator and right to cross-examine parties and witnesses, and adjudications reached by school administrators operating under a federal mandate to apply the lowest possible standard of evidence."  Id.

177.    Due process protections and other requirements set forth in the Proposed Regulations include (with citation to proposed rule number):

---

[20] "Recipient," as used in the Proposed Regulations, refers to schools and universities who are recipients of Federal financial assistance.  Id. ("The proposed regulations would also specify how recipient schools and institutions covered by Title IX (hereinafter collectively referred to as recipients or schools) . . . .").

A. Complainants and respondents must be treated equitably (34 CFR § 106.45(b)(1));

B. Credibility determinations may not be based on a person's status as a complainant, respondent, or witness (§ 106.45(b)(1));

C. Notice of allegation provided to the parties must include sufficient details known at the time, including the identities of the parties involved in the incident, if known, the specific section of the recipient's code of conduct allegedly violated, the conduct allegedly constituting sexual harassment, and the date and location of the alleged incident, if known (§ 106.45(b)(2));

D. Grievance procedures must require an objective evaluation of all relevant evidence, including both inculpatory and exculpatory evidence (§ 106.45(b)(1)(ii));

E. Grievance procedures must provide an equal opportunity for the parties to present witnesses and other inculpatory and exculpatory evidence (§ 106.45(b)(3)(ii));

F. Grievance procedures must provide both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility, so that each party can meaningfully respond to the evidence prior to the conclusion of the investigation (§ 106.45(b)(3)(iii)); and

G. Grievance procedures must include a live hearing at which the parties must be permitted to cross-examine each other and all other witnesses (§ 106.45(b)(3)(iv).

178.    In May of 2020, the Department issued the Final Regulations governing how colleges and universities must handle and investigate allegations of sexual misconduct.  The Final Regulations implemented substantially all the changes set forth in the Proposed Regulations.  The Final Regulations went into effect on August 14, 2020.

179.    Prior to September 2019, Dartmouth utilized a single-investigator model for investigating allegations of sexual assault which utilized a single investigator who conducted fact finding and made a final determination of responsibility.  The process did not include any live hearings.  Following the investigator's final report, a panel of administrators and faculty would be convened, but only to determine an appropriate sanction; the panel did not have authority to review the investigator's findings.

180.    From September 1, 2019 and through August 13, 2020, Dartmouth adopted a modified single-investigator model, which added a hearing panel that could conduct a live hearing following the investigator's final report and had the authority to review the investigator's findings for error.  The hearing panel also determined the appropriate sanction when it upheld a finding of responsibility.

181.    Dating at least back to 2013, student groups and others have criticized and put pressure on Dartmouth in the form of protests and demonstrations over Dartmouth's handling of sexual assault allegations.

182.    In response to the pressure, Dartmouth canceled classes and instituted alternative programming centered around the issues raised by the protesters.

183.    In 2014, former Dartmouth College Dean Rebecca Biron published an article titled "BEHIND CLOSED DOORS: RAPE, MURDER, AND THE MISPLACED CONFIDENCE OF MEN."

184.    The article expressed an assumption that men are violent, stating: "[w]hat makes it so hard for some men to question their own assumptions and so easy for them to act boldly and brutally when faced with closed doors?"

185.    In that article, Dean Biron equated a Dartmouth undergraduate student who was acquitted by a jury of allegations of non-consensual sex with a classmate to Oscar Pistorius, the South African athlete who admitted to shooting and killing his girlfriend.

186.    Dean Biron concluded her article by stating: "We must demand of men, whether in college or not, a bit more self-doubt and a bit less self-confidence when they are faced with closed doors, whether they be physical, verbal, or figurative. The legal system values epistemological humility in order to protect the innocent; individuals should too."

187.    Dean Biron stepped down as the Dean of Dartmouth College as of June 30, 2018.

188.    She was succeeded by Professor Kathryn Lively, a professor of sociology, who was appointed interim Dean of the College starting July 1, 2018 and made permanent Dean of the College in June of 2019, and was the administrator responsible for reviewing Doe's appeal of the Hearing Panel's affirmation of the Investigator's findings and conclusions and the Panel's sanction in this case.

189.    Dean Lively's research and teaching focus on emotion, identity, face-to-face interaction, social psychology, and gender studies.

190.    Dean Lively is reported in The Dartmouth to have said that her vision for the role of Dean has been shaped by her predecessor.  Specifically, "It will be a very hard task to fill Rebecca Biron's shoes," Lively said.  And, she said, "Through [Dean Biron], I've learned to keep my eye on the bigger picture and to remember why it is that we do this work.  She's been inspirational."

191.    Since 2016, Dartmouth's student paper, The Dartmouth, has published dozens of articles about sexual misconduct, most focused on instances of sexual misconduct at Dartmouth and Dartmouth's handling of those incidents.

192.    In February 2017, as reported by The Dartmouth, Dartmouth students staged performances addressing violence against women.

193.    In March 2017, as reported by The Dartmouth, the federal government opened its third investigation into Dartmouth's handling of sexual misconduct cases. The first two complaints to the federal government were filed by students in 2013 and 2015 and remained open at the time the third complaint was filed.

194.    In May 2017, as reported by The Dartmouth, there were numerous incidents of threats of violence against female students at Dartmouth.

195.    As reported by The Dartmouth, students staged a rally to speak out about sexual violence on campus in response to the threats against Dartmouth women.

196.    President Phil Hanlon responded to the May 2017 incidents by stating "sexual assault, gender-based harassment, interpersonal violence and stalking have no place in our community."

197.    In June 2017, the Senior Survey published in The Dartmouth noted that "[s]exual assault policy has proved a very salient issue over the last four years.  Fifty-one percent of seniors thought sexual assault prevention efforts were not very effective or not at all effective during their time at Dartmouth; 31 percent said they were somewhat effective and only 4 percent said very effective. More students were also dissatisfied (45 percent) with the amount of attention and resources devoted to preventing sexual assault from the College and other organizations than were satisfied (35 percent)."

198.    In May 2018, there was a robust student debate in The Dartmouth over what actually constitutes consent for purposes of sexual activity in response to members of the sexual assault prevention groups Movement Against Violence and the Student and Presidential Committee on Sexual Assault placing signs on campus stating that "Unenthusiastic consent is not consent."  The student-written pieces largely discussed the prevalence of sexual assault on Dartmouth's campus, discounted allegations of false reports, and urged Dartmouth to take greater action to prevent sexual assault on campus.

199.    In June 2018, The Dartmouth published another Senior Survey focusing attention on Dartmouth's sexual assault policies, noting that "female students express lower satisfaction" with Dartmouth's efforts than male students.

200.    In August 2018, The Dartmouth reported another student demonstration where students chanted, "rapists are not welcome here," and expressing "solidarity with survivors of sexual violence," and "stress[ing] the necessity of supporting survivors and holding offenders accountable."  One student expressed "that she was tired of the fact that the fear of being accused of sexual assault has sometimes been taken more seriously than the actual victims of sexual assault . . ."

201.    In September 2018, The Dartmouth published an article entitled "A retrospective on discussions surrounding sexual assault," summarizing the atmosphere at Dartmouth as follows:

> Like at many colleges across the United States, sexual misconduct has become a significant source of discussion for both administrators and students at the College in recent years. Many student groups actively work to promote discussions about the topic and to eradicate sexual violence on campus. Administrators have implemented numerous policies and programs to combat sexual misconduct, earning the College an award for excellence in preventing sexual assault in 2017. Despite these measures, however, sexual misconduct has continued, sometimes forcing Dartmouth into the national media spotlight.

202.    The article relates that, in 2014, in response to an inappropriate post on a message board and sexual assault allegations on campus, a student activist organization "created a petition encouraging Dartmouth to make concrete changes to its methods of addressing these instances of sexual assault.  The petition, which gained 50,000 signatures, told the College, 'Sexual assault is serious.  Treat it that way.'"

203.    According to the article, the petition suggested "that students found guilty of sexual assault be expelled."

204.    The article quotes current Dartmouth Title IX coordinator, Kristi Clemens, as

saying, "We have really since 2014 ramped up how we talk about sexual misconduct, both in

reporting and in expectations."

205.    The article reported that "Clemens finds reassurance of the College's progress [in

sexual assault policy]" in the fact that reported incidents are on the rise and that Dartmouth was

"third in the United States for reported rapes in 2014 . . . ."  She said, "We know from national

data that sexual assault is happening on all college campuses . . . .  If we're seeing more reports,

that's actually a good thing because then we're getting resources to those reporting parties where

we're going through potentially a conduct hearing and holding people accountable for harming

others in the community."

206.    On September 28, 2018, in the midst of the U.S. Senate hearings regarding the

nomination of Justice Brett Kavanaugh to the U.S. Supreme Court, the leadership of Dartmouth's

Student Assembly sent an email to all undergraduate students at Dartmouth with the subject line

"Dr. Ford: We believe you."  The body of the email presented an example of the pervasive view

at Dartmouth that accusers of sexual assault are to be believed simply because of their status as

accusers:

> Following yesterday's Senate hearing, we, the members of Student Assembly,
> want to express our admiration for Dr. Christine Ford and her tremendous bravery
> - we believe you, Dr. Ford. You have made your voice heard at immense personal
> cost, and in doing so, you have empowered survivors everywhere with an
> untouchable example of courage and resolve.
>
> It is unfortunate and revealing that telling your story has required such courage.
> All of us should take note of the ways we contribute to a society where survivors
> of sexual assault feel systematically silenced.

207.    In November 2018, The Dartmouth reported that Dartmouth was in the national

news when seven women filed a $70 million lawsuit against the College for ignoring over 16

years of sexual harassment by three male professors.  There were similar articles in news outlets across the country, including an article in Rolling Stone Magazine on November 15, 2018.  This lawsuit was ultimately settled in 2020 for $14 million.

208.    On December 3, 2018, The Dartmouth published an article entitled "Alumni question donating after sexual harassment lawsuit."  In the article, several regular female donors state that they will not donate money to Dartmouth as a result of the allegations set out in the lawsuit.  Another donor said that she would not donate to Dartmouth unless Dartmouth "close[s] its fraternities."

209.    An article in The Dartmouth published December 10, 2018, focuses on the lawsuit and criticizes Dartmouth's "practices concerning sexual assault survivors," focusing solely on female survivors, and concludes by saying, "The administration knows that if they don't do anything, it's not good public relations for them . . . As disturbing as it is that that's kind of a necessity, it's helpful right now for us to get things that really need to change to change, now that the College is listening."

210.    On December 12, 2018, President Hanlon sent an email to Dartmouth students, faculty, and staff providing a statement on the lawsuit.  In the email, President Hanlon states: "We owe it to the students who came forward in 2017, as well as to past generations of Dartmouth **women** and current and future students, faculty, and staff, to make our community the best it can be."  (Emphasis added).

211.    Another article in The Dartmouth published on December 17, 2018 describes a "letter in support of sexual harassment plaintiffs," that comes from a group called Dartmouth Community Against Gender Harassment and Sexual Violence, again, solely focusing on female plaintiffs, that was signed by "nearly 800 alumni, current undergraduate and graduate students,

faculty, staff and other members of the Dartmouth community," which was presented to College President Phil Hanlon and the Board of Trustees on December 6, 2018.  In the letter, students and alumni openly criticize Dartmouth for being biased against women in its consideration of sexual assault complaints. In response, President Hanlon sent a community-wide email assuring the recipients, "We unequivocally share the goal of the women who brought the lawsuit," against the three professors, and promising "a 'sweeping plan' to combat sexual assault on campus, citing steps already taken in the 2015 Moving Dartmouth Forward campaign and the 2016 Inclusive Excellence campaign."

212.    On January 1, 2019, the Boston Globe published an article titled "After sexual harassment case, what's next for Dartmouth College?", in which it discussed reactions to the lawsuit brought against Dartmouth regarding alleged sexual harassment by the psychology professors.  Diana Whitney, spokeswoman for the Dartmouth Community Against Gender Harassment & Sexual Violence, was quoted: "There needs to be a really broad cultural change at the institutional level . . . . We don't see this is as an isolated incident at Dartmouth."  The article confirms prior reporting that "alumni have expressed frustration and threatened to withhold donations over the handling of the case."

213.    On January 3, 2019, on the first day of the 2019 Winter Term, President Hanlon sent an email to Dartmouth students, faculty and staff unveiling Dartmouth's new Campus Climate and Culture Initiative ("C3I"), which "will seek to foster healthy, professional, and nurturing relationships among faculty, staff, and students.  President Hanlon explained that C3I "embrace[s] and expand[s] upon the recommendations for institutions of higher education made in a groundbreaking report . . . from the National Academies of Sciences, Engineering, and Medicine (NASEM), called 'Sexual Harassment of **Women**: Climate, Culture, and

Consequences in Academic Sciences, Engineering, and Medicine.'"  (Emphasis added).
President Hanlon also announced that Dartmouth would be revising its sexual misconduct policy,
establishing mandatory Title IX training for faculty, staff, post-doctoral scholars, and graduate
and professional students, and expanding the capacity of its Title IX office.  The same day, the
Boston Globe published an article entitled "Dartmouth College outlines steps to address sexual
harassment," publicizing Pres. Hanlon's email to the Dartmouth community, and stating that a
student and alumni group called the Dartmouth Community Against Gender Harassment and
Sexual Violence, "had demanded that administrators change the 'broader culture that permits
sexual misconduct to recur.'"

214.    In May of 2019, The Dartmouth reported on a new website and Instagram page—
"Dartmouth Speaks"—"created by a group of Dartmouth students and alumni to anonymously
share the experiences of people in the Dartmouth community who have faced sexual violence or
harassment."

215.    It was within the context of Dartmouth's history of multiple federal
investigations, numerous articles and complaints criticizing Dartmouth's process for handling
sexual assault complaints, student and alumni group demonstrations and letters to the President
and Board of Trustees criticizing the handling of sexual assault allegations by female students,
criticism brought about by the November 2018 lawsuit, and decreased and withheld alumni
donations that Dartmouth investigated the allegations against Doe and suspended him from the
school.

216.    Additionally, on information and belief, and at least in part as a result of the fear
of negative press and adverse action from the federal government, alumni groups, and lawsuits,
current Dartmouth employees involved in the investigation of Smith's report against Doe have

admitted that when the Title IX office receives a report of an alleged violation of Dartmouth's sexual misconduct policies from a female student, they believe that the reporting student is experiencing the trauma that she claims to be experiencing before the responding student is notified or any evidence is heard.

217.    Specifically, Ms. Clemens has stated that she "believe[s] that [Title IX] reports are made in good faith, and so if someone is speaking about their experience, I believe their account of their experience and respond accordingly."  On information and belief, at Dartmouth, reporting parties are disproportionately female, and responding students are disproportionately male.

218.    This pre-investigation pattern and practice of believing the reports of female students results in implicit bias and partiality against the male responding students whom the female students have accused of sexual misconduct.

219.    In fact, on information and belief, based on their experience, current and former Dartmouth employees, including current and former employees familiar with the Dartmouth football program and the cases of Black male student athletes who have been accused of Title IX violations over some or all of the last 15 years, including the 9 Black student athletes on the football team referenced herein who have all been suspended or expelled from Dartmouth, believe that Dartmouth's Title IX process is biased against male students, and especially Black male student-athletes, who are viewed as guilty upon being accused and in favor of female accusers whose accusations are taken at face value and not subject to the same scrutiny as responding male students' testimony and evidence.

**<u>Consequences of Dartmouth's Decision</u>**

220.    If Dartmouth's suspension of Doe is allowed to remain, Doe will be irreparably harmed.

221.    The suspension from Dartmouth will significantly affect Doe's undergraduate career, graduate school, and career prospects in elementary education.

222.    If the suspension is allowed to remain, any classes Doe takes at any other academic institution during the suspension period are not eligible for transfer or application to his Dartmouth degree upon his readmission at the end of his suspension period, therefore effectively preventing him from continuing his education while this suit is pending, and ultimately ensuring that he has a gap in his transcript even if he prevails in this lawsuit.

223.    Without appropriate redress, the unfair outcome of Dartmouth's flawed and biased disciplinary process will cause irreparable harm to Doe by not permitting him to complete his education at Dartmouth, impairing his ability to continue his education elsewhere and later on to attend graduate school, potentially depriving him of at least a year of athletic eligibility (likely his entire collegiate athletic career) and the accompanying benefits, and impacting his ability to work in his chosen field should he complete his bachelor's degree.

## CAUSES OF ACTION

### COUNT I.
### 20 U.S.C. § 1681 et seq.
### TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
### (Erroneous Outcome and Selective Enforcement)

224.    Doe repeats and realleges the allegations above as if fully set forth herein.

225.    Pursuant to Title IX of the Education Amendments of 1972, Dartmouth is prohibited from subjecting Doe to a disciplinary proceeding where sex is a motivating factor in the decision to impose sanctions.

226.     Pursuant to Title IX of the Education Amendments of 1972 Dartmouth is further prohibited from providing a disciplinary proceeding that is not prompt or equitable.

227.     Dean Lively, the administrator responsible for the final appellate review of Doe's case, followed in the footsteps of her predecessor who held the belief that men are inherently violent, and that women making accusations of sexual misconduct are to be believed, even if a jury has found their story to lack credibility.

228.     Further, the Title IX coordinator expressed that she believed increased reporting of sexual assault to be a positive development so that Dartmouth could hold more people accountable.

229.     Dartmouth felt undue pressure from the federal government, campus student groups, the national media, and alumni donors to support female reporters by finding male responding parties responsible for committing sexual assault.

230.     On information and belief, current Dartmouth employees involved in the Title IX process in Doe's case, believed the female reporting student's report from the time her report was made, leading them to be inherently biased against Doe's denial of her report and evidence supporting his position, resulting in an erroneous finding that Doe was responsible for the conduct as alleged by Smith.

231.     On information and belief, Doe, was presumed guilty by Dartmouth's Title IX administrators, the Investigator, the Hearing Panel, and Dean Lively because he is a Black male student-athlete, whereas the same actors took Smith's allegations at face value and inherently believed them because she was a female reporting student.

232.     Dartmouth's Investigator, employees, and administrators made incorrect determinations of fact, ignoring substantial evidence presented that supported Doe's innocence

and undermined Smith's claims against him, as set forth herein, resulting in an erroneous outcome in his case.

233.    The erroneous outcome of ordering Doe's suspension from Dartmouth was caused in substantial part by gender bias against males in cases involving allegations of sexual misconduct. This bias is reflected in the patterns of decision making and procedural missteps demonstrated by Dartmouth throughout the entire investigative, decision-making, and review process in this case.

234.    Additionally, Dartmouth exhibited patterns and practices of decision-making that show that the decision to pursue a Title IX investigation and proceeding against Doe and not to initiate a Title IX action against Witness 2 or even Smith were motivated by Dartmouth's pattern and practice of intentional animus against Doe's gender.

235.    Doe and Smith were similarly situated in that each reported to Dartmouth's Title IX office that they were the victim of a violation of the SMP.  However, Dartmouth encouraged and endorsed Smith's claims against Doe and discouraged, minimized, and wrongfully declined to exercise jurisdiction over Doe's claims for retaliation against Witness 2 and possibly Smith, if Witness 2 was acting as an agent for Smith by retaliating against Doe for defending himself in Dartmouth's Title IX investigation.

236.    Dartmouth was deliberately indifferent to Doe's claim that Witness 2 and possibly Smith retaliated against him for participating in the Title IX investigation by presenting evidence in his own defense and breached their duty to maintain confidentiality of the proceeding by publicly removing Doe from a group chat of over 300 people as a result of Smith's allegations.

237.    Dartmouth's violations of its obligations under Title IX proximately caused Doe to sustain tremendous damages, including, without limitation:  economic injuries, reputational

damages, and the loss of educational and post-graduate opportunities and other direct and consequential damages.

238.    Doe is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action for the harm he suffered as a result of Dartmouth's violation of its Title IX obligations.

**COUNT II.**
**42 U.S.C. § 2000d et seq.**
**TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**
**(Racial Discrimination)**

239.    Doe repeats and realleges the allegations above as if fully set forth herein.

240.    Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

241.    Doe is African American and is a member of a protected class.

242.    Doe had an excellent academic and athletic record before arriving at Dartmouth and qualified to continue his education and athletic career at Dartmouth and would be currently doing so but for the suspension erroneously imposed as a result of the flawed and biased Title IX process as set forth herein.

243.    Doe suffered an adverse action in pursuit of his education by Dartmouth in that he was suspended from Dartmouth for eight terms as a result of an investigation, hearing, and sanctioning process and application of that process that was applied differently against Doe because he is Black and that Dartmouth was deliberately indifferent to his repeated claims of

racial stereotyping, implicit racial bias, and systemic racism that resulted in his wrongful suspension.

244.    As set forth above, implicit and explicit systemic, structural racism pervades Dartmouth's culture such that over 300 mostly Black professors, administrators, alumni, and students, including Doe, drafted and signed a letter to Trustees of Dartmouth College and others describing Dartmouth as a "racially hostile" environment.

245.    In this case, the Investigator exhibited implicit racial bias in her application of stereotypes and use of racially coded language and microaggressions against Doe to characterize him as a hypersexual, physically imposing, aggressive Black male and used these racially discriminatory stereotypes and dog whistles to erroneously make adverse credibility determinations and the ultimate finding of responsibility against Doe.

246.    When Doe raised the Investigator's implicit racial bias in his appeal to the Hearing Panel, Dartmouth nonetheless selected an all-white Hearing Panel to hear his challenge of racial discrimination and implicit racial bias, showing deliberate indifference to Doe's claims of racial bias and animus.

247.    In response to Doe's objection and request for at least one Black panel member to review the finding in his case that he challenged in part as racially biased, Dartmouth, through Ms. Clemens, again selected another panel member who was not Black and, when pressed again by Doe, admitted that Dartmouth did not have any qualified African American staff members who had received the required training available to serve on his Hearing Panel.  As set forth above, Dartmouth's inability or unwillingness to provide the required training to any Black faculty or administrators such that they would be qualified generally and available to serve on

Doe's Hearing panel is a result of and a manifestation of the long-standing systemic racism at Dartmouth.

248.    Once Doe was found responsible, that finding was upheld by the Hearing Panel without any Black representation, and the same panel suspended Doe for eight terms. Like at least eight other Black student athletes who had been suspended or expelled as a result of an adverse Title IX finding within the last 15 years, Doe's suspension was imposed and he was removed from the school and the football team immediately, whereas at least one white student athlete during that same time period was allowed to finish his athletic season before being removed from the school and team, and no Title IX complaints against white football players were referred by the Title IX office for formal investigation during that same time period whatsoever.

249.    Dartmouth was deliberately indifferent to Doe's repeated reports of implicit racial bias in the Investigator and the Hearing Panel, as well as his request for a Black Hearing Panel member.

250.     As such, an intentional and motivating factor in Dartmouth's adverse Title IX finding against Doe, his suspension, and its immediate imposition was Doe's race.

251.    Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

252.    Thus, Plaintiff is entitled to all legal and equitable remedies available including all applicable damages, prejudgment interest, attorneys' fees, costs, and other compensation in an amount to be determined upon the trial of this action.

## COUNT III.
## Breach of Contract

253.    Doe repeats and realleges the allegations above as if fully set forth herein.

254.    Doe paid Dartmouth sums of money for his education, and in return, the College contracted to provide Doe with access to its undergraduate degree program.

255.    The relationship between the parties is contractual in nature, and each party owes the other certain duties, some of which can be found in Dartmouth's written policies.

256.    By the facts alleged herein, Dartmouth breached its contract with Doe by instituting and prosecuting an investigation and adjudication in violation of its policies and procedures, specifically, the SMP's and PRP's promise of a "fair, thorough, and impartial" investigation and adjudication process.

257.    Additionally, by the facts alleged herein, Dartmouth breached its contract with Doe by instituting and implementing an investigation and adjudication that did not comport with basic elements of fundamental fairness, including procedural and substantive fairness.

258.    As a direct and proximate result of that breach, Doe suffered the harms described above and is entitled to all available legal and equitable remedies.

## COUNT V.
## Breach of Covenant of Good Faith and Fair Dealing

259.    Doe repeats and realleges the allegations above as if fully set forth herein.

260.    Every contract contains within it an implied covenant of good faith and fair dealing.

261.    By the facts alleged herein, Dartmouth breached that covenant by exceeding the limits of reasonableness by pursuing that investigation and adjudication in an unfair and biased

manner, thereby exercising its contractually-vested discretion in a manner that thwarted Doe's reasonable expectation as to the essence of the contract.

262.    As a direct and proximate result of that breach Doe suffered the harms described above.

**COUNT VI.**
**42 U.S.C. § 1981**
**(Equal Rights under the Law—Racial Discrimination)**

263.    Doe repeats and realleges the allegations above as if fully set forth herein.

264.    42 U.S.C. § 1981 in relevant part requires that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

265.    42 U.S.C. § 1981 protects the African American student's "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" pursuant to Dartmouth's SMP and PRP.

266.    Dartmouth's SMP and PRP represent a contractual commitment to Doe.

267.    As an African American student, Doe is a member of a protected class.

268.    Doe was qualified to attend Dartmouth, was accepted at Dartmouth, and was a member of the Dartmouth football team.

269.    Doe suffered adverse actions in that he was deprived of his contractual rights pursuant to Dartmouth's SMP and PRP as an African American student in all the ways set out herein.

270.     As a result, Doe was erroneously found responsible for violating Dartmouth's SMP, suspended for eight terms, was removed from campus, and was removed from the football team immediately upon imposition of his sanction.

271.     Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed, and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

272.     Thus, Plaintiff is entitled to all legal and equitable remedies available including all applicable damages, prejudgment interest, attorneys' fees, costs, and other compensation in an amount to be determined upon the trial of this action.

## COUNT VII.
### Negligence

273.     Doe repeats and realleges the allegations above as if fully set forth herein.

274.     Dartmouth and its agents had a duty of care, imposed on it by its policies and federal law and voluntarily undertaken, to handle allegations of sexual misconduct and/or violence fairly and consistently, without bias or prejudice, especially on the bases of sex and race.

275.     By the facts alleged herein, Dartmouth and its agents breached that duty by pursuing the investigation and adjudication of Smith's complaint against Doe in a manner that deviated from its policies and federal law and was unfair, biased, and prejudiced on the bases of sex and race.

276.     As a direct and proximate result of that breach, Doe suffered the harms described above.

277.    Doe is entitled to enhanced compensatory damages as a consequence of Dartmouth's wanton, malicious, oppressive and aggravating conduct alleged herein.

\*       \*       \*

WHEREFORE, John Doe respectfully requests that this Court enter judgment against defendant on all counts of this complaint. Doe further requests that this Court:

1.    Issue an injunction enjoining Dartmouth from enforcing Doe's suspension and ordering it to allow him to enroll in classes, attend classes, and participate in all campus activities pending the outcome of this action;

2.    Order defendant to reverse its finding that Doe violated its policies, and expunge his record;

3.    Order defendant to reinstate Doe as a student in good standing;

4.    Award Doe damages and enhanced compensatory damages in an amount to be determined at trial;

5.    Award Doe the reasonable costs of this action, including attorneys' fees;

6.    Grant such other and further relief as this Court deems equitable and just.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**

Date: January 25, 2021                    Respectfully submitted,

                                          /s/ William E. Christie
                                          WILLIAM E. CHRISTIE
                                          NH Bar #11255
                                          S. AMY SPENCER
                                          NH Bar #266617
                                          ALEXANDER W. CAMPBELL
                                          NH Bar# 268958
                                          SHAHEEN & GORDON, P.A.
                                          107 Storrs Street
                                          Concord NH 03302
                                          (603) 225-7262
                                          wchristie@shaheengordon.com
                                          saspencer@shaheengordon.com
                                          acampbell@shaheengordon.com

                                          *Attorneys for plaintiff John Doe*