UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


John Doe

     v.                                    Civil No. 21-cv-085-JD
                                         Opinion No. 2021 DNH 107
Trustees of Dartmouth College



O R D E R

John Doe brings this suit, related to his suspension from
Dartmouth College for sexual misconduct, alleging that Dartmouth
violated Title IX of the Education Amendments of 1972, 20 U.S.C.
§ 1681, et seq.; violated Title VI of the Civil Rights Act of
1964, 42 U.S.C. § 2000d, et seq.; breached the student-college
contract; breached the covenant of good faith and fair dealing;
engaged in racial discrimination that violated his entitlement
to equal rights under the law, 42 U.S.C. § 1981; and injured him
through negligent acts or omissions.  Dartmouth moves to dismiss
the complaint.  Doe objects.


Standard of Review

In considering a motion to dismiss, the court asks whether
the plaintiffs have made allegations that are sufficient to
render their entitlement to relief plausible.  Manning v. Boston
Med. Ctr. Corp., 725 F.3d 34, 43 (1st Cir. 2013).  The court

accepts all well-pleaded facts as true and draws all reasonable inferences in the non-moving party's favor.  Hamann v. Carpenter, 937 F.3d 86, 88 (1st Cir. 2019).  The court, however, disregards conclusory allegations that simply parrot the applicable legal standard.  Manning, 725 F.3d at 43.  To determine whether a complaint survives a motion to dismiss, the court should use its "judicial experience and common sense," but should also avoid disregarding a factual allegation merely because actual proof of the alleged facts is improbable.  Id.

Background

A.    Alleged Sexual Assault

In the early morning of February 9, 2020, Sally Smith, a student at Dartmouth was walking back to her dorm after having consumed a large amount of alcohol.[1]  At approximately 1:41 A.M., Smith called Doe, who was also a student at Dartmouth, and asked him for help returning to her dorm room because she could not remember where it was, presumably as a result of intoxication.  Smith contacted Doe, specifically, because Doe did not drink.[2]

---

[1] John Doe and Sally Smith are pseudonyms, used to protect the privacy of those persons.

[2] The alleged sexual assault occurred during Dartmouth College's "Winter Carnival," an event at which many Dartmouth students "drank alcohol heavily."  Doc. 1 ¶ 37.

Doe, who had been sleeping, agreed to meet Smith.  Doe put on a
coat and shoes.  He did not put a shirt on underneath his coat.

Doe met with Smith.  He did not know where Smith lived.
Smith led Doe to her dorm.  In Smith's dorm room, Smith and Doe
talked for a while about the events of the night that led to her
calling Doe for assistance.  Smith and Doe "began kissing and
progress[ed] to further sexual contact."  Doc. 1 ¶ 41.  Doe
asked Smith twice if she wanted to have sexual intercourse, and
Smith responded affirmatively both times.  Doe and Smith
attempted intercourse.  No penetration occurred.  Doe left and
went back to sleep in his room.  A few days later, Smith
reported to Dartmouth's Title IX office and the Hanover Police
Department that Doe had sexually assaulted her.


B.   Dartmouth Policies & Procedures

When Smith made her report about the sexual assault,
Dartmouth had two written policies applicable to allegations of
sexual assault by students: the "Sexual and Gender-Based
Misconduct Policy" ("SMP") and the "Process for Resolving
Reports Against Students" ("PRP").[3]

---

[3] Doe attached both policies to his complaint.  Doc. 1-1, 1-
2.

1. <u>Sexual and Gender-Based Misconduct Policy</u>

The SMP applies to certain conduct that is related to Dartmouth either by location, context, or effect. Specifically, the SMP governs conduct that "occurs on Dartmouth premises or premises leased by or otherwise under the control of Dartmouth"; that occurs "in the context of a Dartmouth employment, education, or research program or activity, including but not limited to Dartmouth-sponsored, Dartmouth-funded or otherwise Dartmouth supported study off campus and/or abroad, research, internship, mentorship, summer session, conferences, meetings, social events, or other affiliated programs or premises, either online or in person"; or that "regardless of location or context, has continuing adverse effects occurring on Dartmouth premises or in any Dartmouth employment, education, or research program or activity." Doc. 1-1 at 3, SMP Art. III.

The SMP prohibits, among other misconduct, "sexual assault," which it defines as "having or attempting to have sexual contact with another individual without consent." <u>Id.</u> at 8, SMP Art. VII.B. It defines "sexual contact" to include "sexual touching" as well as sexual intercourse. "Consent" is defined as "an affirmative or willing agreement to engage in specific forms of sexual contact with another person" and

"consent cannot be obtained . . . [b]y taking advantage of the incapacitation of another individual."  Id.


2. Process for Resolving Reports

When prohibited conduct is reported to Dartmouth's Title IX office, the PRP sets out a multi-step resolution process.  The first step requires the Title IX coordinator or deputy coordinator to determine whether the Title IX office has "jurisdiction", that is, whether Title IX's scope covers the reported conduct.  If the Title IX office's "jurisdiction" exists, the Title IX office proceeds to an "Initial Assessment," which consists of an investigation and making a determination as to whether the SMP applies to the report.  In addition, the Title IX office determines whether informal or formal resolution as well as remedial protective measures are appropriate.

If the Title IX office refers the report for formal resolution, as it did with Smith's report, the Title IX office "will appoint one or more trained investigators to conduct a prompt, thorough, fair and impartial investigation."  Doc. 1-2 at 10, PRP at Art. VII.A.2.  "The role of the investigator will be to gather information through interviews of the Complainant, Respondent, and witnesses and synthesize the information in a report that will be provided to the Complainant, Respondent, and the Title IX Hearing Panel (which is constituted as described

below).  The investigation report will include all relevant information provided by either party that will be used in the determination of responsibility or sanction."  Id.

Under the policy, "[a]ny investigator used by Dartmouth will receive annual training on the issues related to sexual and gender-based harassment, sexual assault, dating violence, domestic violence, and stalking, and on how to conduct an investigation that is fair and impartial, provides parties with notice and a meaningful opportunity to be heard, and protects the safety of complainants while promoting accountability."  Id. at 11.  An investigator "will be impartial and free from conflict of interest or bias."  Id.

At the beginning of an investigation, the Title IX coordinator "will" notify the Complainant and Respondent about the nature of the reported conduct and the reported policy violations.  "If the investigation reveals the existence of additional or different potential policy violations . . . the Title IX Office will issue a supplemental notice of investigation."  Id.

After fact-gathering concludes, the investigator is directed to produce an initial investigation report, which contains a summary of all relevant information gathered both supporting and detracting from the accounts of the Complainant, Respondent, or other witnesses.  Both the Complainant and

Respondent are then provided an opportunity to provide feedback to the investigator, and the investigator then produces a final investigative report, which includes a finding as to whether there is, by a preponderance of the evidence,[4] sufficient information to support responsibility for a violation of the SMP.

After the final investigative report is completed, a "Title IX Hearing Panel" convenes to review the finding of responsibility for procedural error that substantially affected the outcome and for proper application of the evidentiary standard. The Hearing Panel is typically comprised of Dartmouth's Director of the Office of Community Standards and Accountability, the Dean responsible for Student Affairs, and a trained staff member who holds an appointment outside of both the Complainant's and Respondent's declared majors or areas of concentration or school. Either party can challenge the composition of the Hearing Panel to the Title IX coordinator on the ground of actual bias or conflict of interest. After a determination of responsibility is made, the Hearing Panel determines the appropriate sanction, which can include

---

[4] Specifically, the PRP states the following: "In all stages of the process, Dartmouth will apply the preponderance of the evidence standard (i.e., more likely than not) when determining whether Dartmouth policy has been violated." Doc. 1-2 at 8, PRP Art. IV.

suspension.  A final determination can be appealed based on
substantial procedural error or bias that materially affected
the outcome and/or sanction as well as new evidence not
reasonably available at the time of the hearing.


        C.    Dartmouth Investigation & Hearing

        On February 26, 2020, Kristi Clemens, who was Dartmouth's
Title IX coordinator, e-mailed a notice to Doe informing him
that Smith had alleged that he sexually assaulted her on
February 9, 2020.  Doe was also notified that an attorney, who
was white and female, at a New England law firm (the
"Investigator")[5] had been retained to investigate Smith's report.

        As part of the investigation process, Doe provided a
written account to the Investigator about his relationship with
Smith and their interactions on February 8 and 9, as well as his
response to Smith's allegations.  In March 2020, Dartmouth told
Doe that it would conduct the investigation remotely as a result
of the COVID-19 pandemic.  See doc. 1 ¶¶ 126-127 (alleging that
Dartmouth in March 2020 announced that it would conduct the
remainder of the Spring 2020 term online and that Dartmouth told
Doe it would continue the investigation remotely).  Doe
requested that the interview occur in person, and Doe offered to

_____

        [5] The identity of the Investigator is not stated in Doe's
complaint.

                                8

participate in an in-person interview that complied with Center for Disease Control guidance relative to the COVID-19 pandemic (i.e., socially distanced and masked). Doe was concerned that "the nature of video conferencing makes it difficult for one to look the other in the eye when answering questions" and that the situation would negatively affect the Investigator's ability to make credibility determinations. Id. ¶ 128. Clemens denied Doe's request for an in-person interview.

The Investigator interviewed Smith, Doe, and other witnesses, and she gathered other evidence from witnesses and Dartmouth through video conferencing. The Investigator interviewed Smith three times: on March 27, May 28, and June 24, 2020. She interviewed Doe twice: on April 9 and June 5, 2020. The Investigator interviewed seventeen other witnesses between April 2 and June 18, 2020.

The Investigator issued a preliminary report on July 31, 2020, which recited the gathered evidence in accordance with the PRP but did not make any conclusion about responsibility. Doe and Smith submitted responses to the report.

On August 24, 2020, the Investigator issued her final report.[6] Applying the preponderance of the evidence standard,

_____

[6] Dartmouth filed, under seal, the complete final report with its motion to dismiss. Doc. 16. In the complaint, Doe discusses the final report and its language at length. Doe does not challenge the authenticity of the final report submitted by

she found that Smith was not "incapacitated" at the time of the alleged sexual assault. The Investigator, however, concluded, by a preponderance of the evidence, that Doe had sexual intercourse with Smith without her consent, in violation of the SMP. Doc. 1 ¶ 95. As to this conclusion, Doe alleges that the Investigator referred to a standard ("valid consent") that is neither defined nor contained within the SMP.[7]

_____

Dartmouth. Because the final report is central to Doe's claims and because its authenticity is not disputed, it "effectively merges into the pleadings" and the court "can review it in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State Street Bank and Tr. Co., 137 F.3d 12, 16-17 (1st Cir. 1998).

[7] In the final report, the Investigator describes the standard for "consent" as applied in her investigation as follows:

> "Consent" is an affirmative and willing agreement to engage in specific forms of sexual contact with another person. Consent requires an outward demonstration, through mutually understandable words or actions, indicating that an individual has freely chosen to engage in sexual contact. Consent cannot be obtained through:

> > 1. the use of coercion or force; or
> > 2. by taking advantage of the incapacitation of another individual.

> Silence, passivity, or the absence of resistance does not imply consent. It is important not to make assumptions; if confusion or ambiguity arises during a sexual interaction, it is essential that each participant stop and clarify the other's willingness to continue. Consent can be withdrawn at any time. When consent is withdrawn and outwardly communicated as such, sexual activity must cease. Prior consent

After the Investigator completed the final report, a
Hearing Panel was convened in accordance with the PRP.
Initially, the Hearing Panel was comprised of Kate Burke,
Katharine Strong, and Ted Stratton.  Doe, however, objected to
the composition of the panel on the basis of race.  He argued
that the all-white panel would be unable to fairly consider the
allegations against him.  Doe requested that an African-American
individual be added to the Hearing Panel.

In response to Doe's objection, Clemens appointed Jedrek
Dineros to the Hearing Panel.  Clemens told Doe that, to her
knowledge, Dartmouth did not have any African-American

---

does not imply current or future consent; even in the
context of an ongoing relationship, consent must be
sought and freely given for each instance of sexual
contact. An essential element of consent is that it be
freely given. Freely given consent might not be
present, or may not even be possible, in relationships
of a sexual or intimate nature between individuals
where one individual has power, supervision or
authority over another. In evaluating whether consent
was given, consideration will be given to the totality
of the facts and circumstances, including but not
limited to the extent to which a Complainant
affirmatively uses words or actions indicating a
willingness to engage in sexual contact, free from
intimidation, fear, or coercion; whether a reasonable
person in the Respondent's position would have
understood such person's words and acts as an
expression of consent; and whether there are any
circumstances, known or reasonably apparent to the
Respondent, demonstrating incapacitation or lack of
consent.

Doc. 16 at 4.

individuals available to serve on the Panel and that Dineros
identified as "BIPOC".[8]

On September 1, 2020, Doe submitted a statement to the
Hearing Panel in response to the Final Report.  Smith submitted
a statement on September 8, 2020.  On September 24, 2020, the
Hearing Panel affirmed the Investigator's findings and
conclusions.  The Hearing Panel suspended Doe from Dartmouth for
eight terms (two academic years).  Doe requested further review
of the Hearing Panel's decision on October 1, 2020.  The Dean of
Dartmouth College upheld the panel's findings and the suspension
on October 12.

### D. Chat Group & Alleged Retaliation

During his time at Dartmouth, Doe was a member of a chat
group "comprised of approximately 300 African American Dartmouth
Students and Alumni."  Doc. 1 ¶ 63.  On June 5, 2020, several
months after the alleged sexual assault and in the midst of the
investigation, the topic of sexual misconduct arose in the chat
group.  When the topic of sexual misconduct arose, one of
Smith's friends, identified in the complaint as Witness #2,
removed Doe from the group.  The removal was public, and one of

_____

[8] BIPOC stands for "Black, Indigenous, and/or Person of
Color."  Doc. 1 ¶ 139.  Clemens did not know how Jedrek self-
identified in terms of race or ethnicity more specifically.

Doe's classmates asked Doe why Witness #2 removed him from the group. Doe reported Witness #2 to the Investigator and Clemens, alleging that Witness #2 had violated the SMP by retaliating against him for defending himself in the investigation of Smith's report. Clemens found that the Title IX Office did not have jurisdiction because the chat group was not Dartmouth-sponsored or Dartmouth-controlled and the allegations were beyond the scope of the SMP.

    E.   Claims

Doe raises several claims of race and gender-based discrimination in his complaint. He also alleges that Dartmouth breached the student-college contract and acted negligently. Specifically, he makes the following claims:

- Count I: violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.;
- Count II: violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq.;
- Count III: breach of contract;
- Count V:[9] breach of the covenant of good faith and fair dealing;
- Count VI: violation of Doe's entitlement to equal rights under the law, 42 U.S.C. § 1981; and
- Count VII: negligence

Doe requests injunctive relief as well as damages.

---

[9] The complaint does not contain a Count IV.

<u>Discussion</u>

Dartmouth moves to dismiss the complaint, arguing that Doe fails to plead factual matter that raises his claim of unlawful discrimination above a speculative level.  Doe objects. Dartmouth filed a reply, and Doe filed a surreply.


A.   <u>Count I (violation of Title IX)</u>

Title IX prohibits colleges that receive federal funding from discriminating on the basis of sex or gender.  <u>See</u> 20 U.S.C. § 1681(a); Haidak v. Univ. of Massachusetts-Amherst, 933 F.3d 56, 74 (1st Cir. 2019).  Specifically, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  § 1681(a).  In Count I, Doe advances three distinct theories about how Dartmouth violated Title IX, namely, "erroneous outcome," "selective enforcement," and "deliberate indifference" theories.  <u>See</u> Haidak, 933 F.3d at 73-74 (noting "erroneous outcome" and "selective enforcement" as distinct theories for attacking a college disciplinary proceeding under Title IX); Doe v. Amherst Coll., 238 F. Supp. 3d 195, 223 (D. Mass. 2017) (discussing deliberate indifference

theory for Title IX violation).  Dartmouth argues that Doe
cannot prevail on any theory.

### 1.  Erroneous Outcome

To succeed on an erroneous outcome theory, a plaintiff must
demonstrate "articulable doubt" about the outcome of the
challenged disciplinary proceeding and allege facts "indicating
that 'gender bias was a motivating factor.'" Doe v. Trustees of
Boston Coll., 892 F.3d 67, 89-90 (1st Cir. 2018).  In its motion
to dismiss, Dartmouth argues that Doe has not made any non-
conclusory allegations that gender bias was a motivating factor
in Dartmouth's finding that he violated Dartmouth's sexual
misconduct policy and suspension of him from the college.  Doe
responds that he was presumed guilty of sexual assault because
he is a male football player and that the Investigator and
Hearing Panel ignored, because of his gender, substantial
evidence that he presented supporting his innocence.

Even assuming that there is "articulable doubt" about the
outcome of the disciplinary proceeding, Doe's complaint lacks
sufficient non-conclusory allegations to plausibly claim that
gender bias was a motivating factor in Dartmouth's decision.
See Doe v. Harvard Univ., 462 F. Supp. 3d 51, 62 (D. Mass. 2020)
(dismissing erroneous outcome Title IX claim that satisfactorily
alleged procedural flaws and an erroneous outcome but failed to

connect those errors with non-conclusory allegations of gender bias).  Doe relies on the Investigator's own gender (female) and her background to support an inference of gender bias.  For example, Doe alleges that she participated in a panel entitled "Off Field Athlete Conduct Issues: Sexual & Domestic Violence," which, Doe claims, establishes "a connection between being a male athlete and sexual violence."  Doc. 1 ¶ 135(H).  Being an athlete is not a protected status under Title IX, and the Investigator's participation in a panel about sexual violence by student athletes does not lead to a plausible inference of bias against males.

Doe also alleges that the Investigator's characterization of the facts evidences a gender bias against males.  For example, Doe alleges that the Investigator's reference in her report that he was not wearing a shirt under his jacket when he met Smith the night of the incident supports an inference of gender bias, because she ignores that many men sleep without a shirt.  That Doe was not wearing a shirt was undisputed, however, and the Investigator's brief discussion of that fact was, in context, consistent with its relative importance to the issues.  Specifically, the Investigator referenced Doe's jacket when he met with Smith as a background detail within the larger context of recounting Smith's testimony and point of view, in which Smith – not the Investigator – made note that Doe was not

wearing a shirt.  Doc. 16 ¶ 44 (discussing Smith's version of
events and stating that Smith said that she wanted to make
"clear" to Doe that she was not going to have sex with him after
she noticed that Doe was shirtless and after he inquired about
her roommate's whereabouts); id. at p.42 ("In explaining the
context of these statements, [Smith] said that she told [Doe]
this when she noticed he had taken off his jacket and was not
wearing a shirt and after he checked [the roommate's] room and
saw that she was not there because [Smith] did not 'want him to
get the wrong idea' about why she had reached out to him that
night."). Therefore, the discussion in the final report about
Doe's state of dress the night of the incident does not
plausibly suggest a gender bias.

Doe also alleges that Dartmouth was under external and
internal pressure to address sexual violence and that Dartmouth
administrators subscribed to a belief that individuals who
report misconduct should be believed versus the accused.  Doe
interprets these alleged beliefs as suggesting a bias against
men.  Doe, however, conflates facts that suggest a possible bias
against individuals accused of sexual misconduct, who may be of
any gender, with facts that suggest a plausible bias against
men.[10]  See Doe v. Harvard Univ., 462 F. Supp. 3d at 62

---

[10] Dartmouth's written policies do not differentiate among
genders.

(rejecting argument that external and internal pressure on schools to address sexual violence issues creates a gender bias against men).  Similarly, Dartmouth's various activities aimed at raising awareness about sexual violence against women on college campuses do not lead to a plausible inference of gender bias against men.  In sum, Doe's allegations of gender bias leading to an erroneous outcome in his disciplinary hearing are speculative and therefore fail to meet the threshold to state a claim under Rule 12(b)(6).  See Doe v. Western New England Univ., 228 F. Supp. 3d 154, 188 (D. Mass. 2017) (adopting report and recommendation that rejected Title IX claim that relied on Title IX officer's "words" and "demeanor" to establish gender discrimination); Dismukes v. Brandeis Univ., 2021 WL 1518828, at *4 (D. Mass. Apr. 16, 2021) ("Dismukes's entire assertion of gender bias arises from the fact that he is a man, his accuser is a woman, and the individuals who conducted the informal investigation were women."); Doe v. Harvard Univ., 462 F. Supp. 3d at 62.

## 2. Selective Enforcement

Doe alleges that Dartmouth selectively enforces its sexual misconduct policies against men, as it referred Smith's report for investigation but refused to refer his report against Witness #2 and/or Smith for retaliation.  Dartmouth moves for

dismissal on the ground that Doe's report and Smith's report were dissimilar. Dartmouth asserts that Doe's report did not involve any Dartmouth program or activity that would implicate the SMP while Smith's report did. Additionally, Dartmouth contends that the circumstances of Doe's report for retaliation were not similar to Smith's report of sexual assault.

Doe responds that identical reports of misconduct are not a necessary element for two individuals reporting misconduct to be similarly situated and that Dartmouth's refusal to exercise jurisdiction for purposes of his report was incorrect. Doe also notes that the standard on which Dartmouth/Clemens declined to exercise jurisdiction (the activity was not part of Dartmouth-sponsored or -controlled activity) is more narrow than the standard in the SMP, which includes activity that has continuing adverse effects on Dartmouth premises or in a Dartmouth educational activity.

To succeed on a Title IX claim based on a selective enforcement theory, a student must demonstrate that the school's decision to initiate a disciplinary proceeding, or the severity of the imposed sanction, was affected by the student's gender. Haidak, 933 F.3d at 74. Notwithstanding the dispute about whether Clemens correctly determined that the SMP did not cover Doe's report that Witness #2/Smith retaliated against him for defending himself against Smith's report that he sexually

19

assaulted her, Doe has not alleged sufficient facts to state a claim for a Title IX violation on the basis of selective enforcement. Specifically, Doe has not alleged facts from which a plausible inference can be made that Clemens's finding that the SMP did not apply to Doe's report was affected by Doe's gender.

Doe compares the treatment of his report to the treatment of Smith's report, but this comparison is not sufficient to raise a plausible inference of gender bias. Smith's report about Doe was dissimilar to Doe's report, as there was no question about the SMP's applicability to the conduct reported by Smith (sexual assault occurring in an on-campus dorm). In contrast, the applicability of the SMP to the conduct reported by Doe was questionable, considering that the conduct involved a chat group that was not directly affiliated with Dartmouth.

Considering the facts that have been alleged about the two reports, Smith's report about Doe is not a proper comparator from which gender or sex-based discrimination can be reasonably inferred. Further, Doe has not alleged other facts that would be sufficient for a jury to reasonably infer that his gender was a factor in Dartmouth's decision not to pursue his report of retaliation. Accordingly, Doe has not stated a claim for relief based on his selective enforcement theory.

### 3. Underline Deliberate Indifference

Dartmouth contends that Doe's theory that Dartmouth violated Title IX by acting with deliberate indifference to sexual harassment fails because he does not allege that Dartmouth was deliberately indifferent to conduct that amounts to sexual harassment. Doe responds that, as a result of his removal from the chat group, he was subjected to rumors about sexual misconduct, which constitute sexual harassment under Title IX.

"Title IX provides a remedy for students, regardless of their sex or gender, who can establish a school's response to their allegations of sexual harassment, including claims of sexual violence, demonstrates deliberate indifference." Doe v. Amherst Coll., 238 F. Supp. 3d at 223. A deliberate indifference Title IX claim requires a demonstration of sex-based harassment that occurred in the college's programs or activities, a deprivation of educational opportunities, and that the defendant was in a position to address the harassment but had a clearly unreasonable response. Doe v. Brown Univ., 896 F.3d 127, 130 (1st Cir. 2018); Doe v. Pawtucket Sch. Dep't, 969 F.3d 1, 9 (1st Cir. 2020).

Doe has not alleged facts sufficient to sustain a claim for deliberate indifference to sexual harassment. He has not

alleged facts showing that he was subjected to sexual harassment or that Dartmouth acted clearly unreasonably by concluding that Witness #2's removal of Doe from the chat group was not within the scope of the SMP.  While Doe alleges that he was subjected to rumors because he was removed from the chat group, Doe does not allege facts that show Dartmouth acted with deliberate indifference to any report he made about those rumors being so severe or pervasive that they constituted sexual harassment. Rather, the allegations taken in Doe's favor show that, at most, Dartmouth misconstrued whether its sexual misconduct policy covered the retaliation alleged by Doe.

For the foregoing reasons, Doe has failed to state a claim for relief as to Count I, violation of Title IX, based on any of his three theories.  Accordingly, Count I is dismissed.

B.     Race Discrimination - Count II (Violation of Title VI of Civil Rights Act, 42 U.S.C. § 2000d) and Count VI (Equal Rights, 42 U.S.C. § 1981)

Dartmouth argues that Doe's claims under Title VI of the Civil Rights Act and § 1981 fail because he does not allege facts showing that it engaged in intentional, race-based discrimination against him.  Dartmouth argues that, without supporting facts, Doe's allegations that the Investigator and Hearing Panel were motivated by implicit bias are not sufficient to support an inference of intentional discrimination.  Rather,

Dartmouth contends, Doe only speculates that racial bias played a part in the outcome of the disciplinary proceedings based on tenuous inferences drawn from unsupported assumptions about the Investigator's experiences and the language she used in the Final Report.  Dartmouth also contends that the Hearing Panel's lack of an African-American or Black participant does not support, on its own, a claim of racial bias and that Doe's allegations that Dartmouth's Title IX office treated reports of sexual misconduct involving white and Black football players differently are insufficient to sustain his claim.[11]

Doe objects, arguing that there are several circumstantial facts that, he contends, give rise to a plausible inference of racial discrimination.  He argues that, for the purposes of alleging a plausible claim for relief, his claim of differential treatment of Black and white football players by the Title IX

---

[11] At times in its motion to dismiss, which was brought under Rule 12(b)(6), Dartmouth suggests that Doe must provide or point to "evidence" to support his claims.  See doc. 14 at 9 ("Bias on the part of the Panel cannot be presumed but must be demonstrated by evidence in the record . . . .  Doe cites no such evidence.").  Rule 12(b)(6), however, does not require Doe to identify or provide specific evidentiary material in support of his claims.  See Hamann, 937 F.3d at 88.  Rather, the factual allegations (as opposed to legal conclusions) made in the complaint, taken as true, must be sufficient to support a plausible inference that intentional racial discrimination occurred in this case.  See id.

office is sufficient to raise a claim of intentional racial
discrimination.

Under § 1981[12] and Title VI of the Civil Rights Act,[13] to
defeat a motion to dismiss under Rule 12(b)(6), a plaintiff must
allege facts from which plausible inferences can be made that
(1) the defendant discriminated against the plaintiff on the
basis of race; (2) the discrimination was intentional; and (3)
the discrimination was a substantial or motivating factor for
the defendant's actions.  Goodman v. Bowdoin Coll., 380 F.3d 33,
34 (1st Cir. 2004).

Intentional racial discrimination can be inferred from
disparate or differential treatment of races.  See Hill v.
Airborne Freight Corp., 212 F. Supp. 2d 59, 65 (E.D.N.Y. 2002)
(sustaining jury's verdict finding intentional racial

---

[12] Section 1981 states the following: "All persons within
the jurisdiction of the United States shall have the same right
in every State and Territory to make and enforce contracts, to
sue, be parties, give evidence, and to the full and equal
benefit of all laws and proceedings for the security of persons
and property as is enjoyed by white citizens, and shall be
subject to like punishment, pains, penalties, taxes, licenses,
and exactions of every kind, and to no other."  42 U.S.C.
§ 1981.

[13] Title VI of the Civil Rights Act states the following:
"No person in the United States shall, on the ground of race,
color, or national origin, be excluded from participation in, be
denied the benefits of, or be subjected to discrimination under
any program or activity receiving Federal financial assistance."
42 U.S.C. § 2000d.

discrimination in violation of § 1981 in part on the basis of
evidence of differential treatment); Lopez v. Webster Central
Sch. Dist., 682 F. Supp. 2d 274, 283 (W.D.N.Y. 2010) (examining
claim of illegal racial discrimination evidenced by differential
treatment under Title VI).  Regardless of the type of
circumstantial evidence used to support the claim, the pleading
must support a connection "between the university's actions and
racially discriminatory motivations."  Doe v. Harvard Univ., 462
F. Supp. 3d at 67.

      Doe has alleged minimally sufficient facts to raise
plausible claims of unlawful intentional racial discrimination
under § 1981 and Title VI of the Civil Rights Act.
Specifically, Doe alleges that, since 2005, "at least 9 Black
male football players were suspended or expelled following Title
IX proceedings whereas no Title IX complaints against white
football players were referred by the Title IX office for formal
investigation during that same time period."  Doc. 1 ¶ 157.  In
addition, "in at least one case from 2005 to the present, a
white student athlete was allowed [to] delay the imposition of a
suspension as a result of a Title IX investigation so that he
could complete his athletic season . . . ."  Id.  Doe alleges
that Black football players, including himself, were not offered
the same opportunity to defer a suspension.

Dartmouth contends that Doe's allegations of differential treatment are insufficiently specific or comparatively similar to Doe's case to support an inference that intentional racial discrimination occurred.  Although Doe does not plead specifics about the sexual misconduct reports about white football players that were not referred by the Title IX office, at this stage it is not necessary to do so because the circumstances of the alleged comparators are facially similar to those of Doe's case (i.e., reports of sexual misconduct made to the Title IX office against football players or other student athletes) and the specifics that Dartmouth asks Doe to plead (i.e., the specific nature of the charges of sexual misconduct made against white football players) are likely within Dartmouth's control and not Doe's control.  See Doe v. Harvard Univ., 462 F. Supp. 3d at 67 ("Plaintiff has provided a comparator group – Caucasian students accused of similar sexual misconduct – coupled with the allegation that the comparator group was treated differently due to their race.  At this stage of litigation, Plaintiff does not need to do more."); see also Menard v. CSX Transp., Inc., 698 F.3d 40, 44-45 (1st Cir. 2012) (explaining that district courts may provide "some latitude" in pleading a plausible claim for relief through allegations made on "information and belief" when the allegations are more than merely speculative and some of the

information needed to prove the claim is in the control of the defendant).[14]

Dartmouth also contends that Doe's allegations of differential treatment do not support a claim of intentional racial discrimination because Doe "fails to account for the possibility that no students made or ultimately decided to pursue any Title IX complaints against white football players" during the fifteen year period between 2005 and Doe's complaint. Doc. 14 at 11. In its reply, Dartmouth goes further and contends that Doe "alleg[e]s that complaints of sexual misconduct have been made only against Black football players, not white football players." Doc. 22 at 6. Doe, however, does not allege in his complaint that complaints about sexual misconduct have only been made against Black football players, nor does Dartmouth's speculation about possible or even plausible explanations for the differential treatment based on facts outside the complaint aid its argument in support of dismissal under Rule 12(b)(6). See Carpenter, 937 F.3d at 92 (explaining that the court accepts the plausible non-conclusory

---

[14] Doe's allegations about how Dartmouth treated allegations of sexual misconduct about Black and white athletes differently were pleaded "upon information and belief." In this case, the court accepts the allegations that are pleaded upon information and belief because they are narrowly-tailored, non-conclusory, and the truth of the allegations can likely be determined by information that is within Dartmouth's control. See Menard, 698 F.3d at 44-45.

allegations of the plaintiff and cannot grant a motion to dismiss based on competing alternative inferences posited by the defendant).  Rather, in his complaint, Doe alleged that no reports about white football players were referred from the Title IX office for formal investigation, while nine reports about Black football players were referred, and those referrals ultimately resulted in suspension or expulsion of the Black students.  It is reasonable to infer, for purposes of the current motion, that at least some reports about white football players were made to the Title IX office but not referred.

Of course, discovery may reveal additional facts beyond those alleged in the complaint that show that any reports accusing white football players of sexual misconduct that were not referred by the Title IX office are insufficiently similar to Doe's case to sustain his claim of intentional racial discrimination or that the differential treatment occurred for a race-neutral reason.  Nonetheless, at this stage Doe has alleged sufficient facts to raise a plausible claim of intentional racial discrimination as to Counts II and VI.  See Doe v. Harvard Univ., 462 F. Supp. 3d at 67.[15]

_____

[15] Because Doe has satisfied his burden of pleading a plausible claim as to intentional race discrimination in Counts II and VI through his allegations of differential treatment, the court does not address Dartmouth's arguments that the other circumstantial facts that Doe alleged in support of his racial

C.    Count III (Breach of Contract)

As to Doe's breach of contract claim, Dartmouth argues, referring generally to its arguments as to gender and race discrimination, that it did not breach the contract terms in its sexual misconduct policy.[16]  Dartmouth's vague reliance on its arguments about Doe's gender and race discrimination claims is not sufficient to demonstrate that his breach of contract claims should be dismissed.  Unlike the discrimination claims, Doe's breach of contract claim does not require him to allege facts from which intentional race or gender discrimination can be inferred.  See Lassonde v. Stanton, 157 N.H. 582, 588 (2008) ("'A breach of contract occurs when there is a failure without legal excuse[] to perform any promise which forms the whole or part of a contract.'") (quoting Poland v. Twomey, 156 N.H. 412, 415 (2007)).  Beyond its reference to its arguments about Doe's race and gender discrimination claims, Dartmouth did not offer any further explanation about why Doe's breach of contract claim should be dismissed.  See Coons v. Industrial Knife Co., 620

_____

discrimination claims are insufficient to support the claims on their own.

[16] In response to the substantive arguments made against dismissal by Doe, Dartmouth elaborates on its argument in its reply brief.  This elaboration, however, does not cure Dartmouth's initial failure to develop any argument sufficient to dismiss Doe's breach of contract claim.

F.3d 38, 44 (1st Cir. 2010) (explaining that "judges are not obligated to do a party's work for him" and that district court's are "free to disregard" arguments that are not developed in briefs); Timmins Software Corp., v. EMC Corp., 502 F. Supp. 3d 595, 606 (D. Mass. 2020) (explaining that superficial arguments may be deemed waived) (citing United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).  Dartmouth's motion to dismiss Doe's breach of contract claim, Count III, is denied.


     D.   Count V (Breach of Implied Covenant of Good Faith and Fair Dealing)

As with its argument about Doe's breach of contract claim, Dartmouth asserts that it did not breach any implied covenant of good faith and fair dealing and refers generally to its arguments that it did not engage in race or gender discrimination.  Dartmouth did not develop an argument in favor of dismissal sufficient for the court to address.  See Coons, 620 F.3d at 44.  The motion to dismiss is denied as to Count V.


     E.   Count VII (Negligence)

As to Count VII, negligence, Dartmouth argues that Doe cannot succeed on a theory that Dartmouth negligently failed to perform its contract and cannot claim damages for economic losses.  Dartmouth contends that Doe has not alleged that it breached any duty it owes to him independent of its contract

with him.  Doe expresses doubt about Dartmouth's contention that
it did not breach any duties to Doe outside of its contract, and
he argues that Dartmouth has an independent common law duty not
to discriminate or to provide certain procedural protections in
university disciplinary proceedings.  In support, Doe cites a
case from the Eighth Circuit and a case from the Eastern
District of Pennsylvania, contending that these courts have held
that universities can be liable for negligent administration of
disciplinary proceedings.

To state a claim for relief for negligence, the plaintiff
must plead facts showing that (1) the defendant owed the
plaintiff a duty; (2) the defendant breached that duty; and (3)
the breach proximately caused the plaintiff's injuries.  Coan v.
New Hampshire Dept. of Envir. Servs., 161 N.H. 1, 7 (2010).
Under New Hampshire law, a negligence claim cannot be based on a
negligent failure to perform contractual promises.  Lawton v.
Great Sw. Fire Ins. Co., 118 N.H. 607, 609, 615 (1978) ("In this
jurisdiction, however, a breach of contract standing alone does
not give rise to a tort action."); see also Broadus v. Infor,
Inc., 2019 WL 1992953 (D.N.H. May 6, 2019).

To the extent Doe brings his claim based on breaches of the
promises Dartmouth made to him in their contract, Doe's claim
fails.  See Lawton, 118 N.H. at 609, 615.  Doe has also failed

to allege that Dartmouth owed him any separate duties beyond the promises made in their contractual relationship.

Neither case cited by Doe is applicable to his claim, which is brought under New Hampshire law.  Doe v. University of St. Thomas is distinguishable because it applied Minnesota law, which unambiguously established that a common law duty of care existed as to a private school's expulsion of students.  972 F.3d 1014, 1017 (8th Cir. 2020).  In the other case cited by Doe, Jackson v. Trustees of the University of Pennsylvania, 2019 WL 309729, at *9 (E.D. Pa. Jan. 23, 2019), there is no analysis of the pertinent issue, which is whether colleges owe an independent duty to students accused of disciplinary infractions to handle disciplinary proceedings with reasonable care.  Doe did not cite any case from New Hampshire courts in support of his negligence claim, let alone a case that indicates New Hampshire courts would recognize the independent tort duties that Doe argues Dartmouth breached, which do not appear to be universally recognized.  Cf. Doe v. Amherst Coll., 238 F. Supp. 3d at 228 (applying Massachusetts law and dismissing claim for failure to adhere to university policies because plaintiff did not show that defendant had a duty in tort to adhere to policies); Cioffi v. Gilbert Enters., Inc., 769 F.3d 90, 94 (1st Cir. 2014) ("[I]t is not [the court's] place to do a party's homework for her."); Coons, 620 F.3d at 44 (noting that adequate

development is particularly necessary where the argument "raises complexities that defy an easy answer"). Accordingly, Doe has not shown that he has stated a plausible claim of relief for negligence. Therefore, Count VII is dismissed.

## Conclusion

For the foregoing reasons, Dartmouth's motion to dismiss (doc. no. 13) is granted in part and denied in part. The motion is granted as to Counts I (sex discrimination in violation of Title IX) and VII (negligence). The motion is denied as to Counts II and VI (race discrimination in violation of Title VI and § 1981), Count III (breach of contract), and Count V (breach of implied covenant of good faith and fair dealing).[17]

SO ORDERED.

Joseph A. DiClerico, Jr.
United States District Judge

July 8, 2021

cc: Counsel of Record.

---

[17] As noted above, Doe's complaint does not contain a Count IV.